# EXHIBIT C



**Freddie Mac**
**MULTIFAMILY**

Loan Agreement – SBL (Revised 11-08-2016)

**Freddie Mac Loan Number:** ▇▇▇▇▇▇▇
**Property Name:**              160 Palisade

| | |
|---|---|
| **Borrower:** | **160 PALISADE REALTY PARTNERS LLC,** a New York limited liability company |
| **Lender:** | **CBRE CAPITAL MARKETS, INC.,** a Delaware corporation |
| **Effective Date:** | August 9, 2017 |
| **Loan Amount:** | $1,080,000.00 |

This Loan Agreement ("**Loan Agreement**") is made by and between Borrower and Lender and is dated as of the Effective Date. Lender has agreed to make and Borrower has agreed to accept a loan for the Loan Amount ("**Loan**") upon the terms and subject to the conditions in this Loan Agreement. The Loan will be evidenced by the Note and will bear interest and be paid in accordance with the payment terms set forth in the Note. Lender and Borrower each acknowledge the receipt and sufficiency of adequate consideration for the making and receiving of this Loan.

### Table of Contents

| | | | | |
|---|---|---|---|---|
| Article I | Key Terms | | Article VII | Transfers |
| Article II | Security Agreement | | Article VIII | Events of Default and Remedies |
| Article III | Personal Liability | | Article IX | Release; Indemnity |
| Article IV | Reserve Funds and Requirements | | Article X | Miscellaneous Provisions |
| Article V | Representations and Warranties | | Article XI | Defined Terms |
| Article VI | Covenants | | | |

## ARTICLE I – KEY TERMS.

### Modifications and Riders

| | |
|---|---|
| ☐ | Loan Agreement modifications are included in Exhibit B |
| ☐ | The following rider(s) are attached to this Loan Agreement: [if checked, list] |

### Base Recourse

A portion of the Indebtedness equal to 0% of the Loan Amount *(see Article III)*

### Tax and Insurance Reserves

| | |
|---|---|
| Taxes – X Collected or ☐ Deferred | Insurance premiums – ☐ Collected or X Deferred |
| *(See Article IV)* | |

### Capital Replacement and Repair Reserve

| | |
|---|---|
| Capital Replacement and Repair Reserve **Monthly** Deposit of 250.00 is ☐ Collected or X Deferred | |
| ☐ | **One Time** Capital Replacement Deposit of $_____ is required for Additional Capital Replacements. |
| X | **One Time** Repair Deposit of $20,030.00 is required for Priority Repairs (including PR-90 Repairs) |
| *(See Article IV)* | |

### Required Additional Capital Replacements and Repairs

| | |
|---|---|
| ☐ | Additional Capital Replacements are required and are listed in Exhibit B. The Additional Capital Replacements Completion Date is ___ days after the Effective Date. |
| X | Priority Repairs (may include PR-90 Repairs) are required and are listed in the Physical Risk Report. |
| *Recourse and other requirements related to Repairs are detailed in Sections 3.03, 3.04, and Section 6.14.* | |

### Special Purpose Reserve

| | |
|---|---|
| ☐ | **One Time** Special Purpose Reserve Fund Deposit in the amount of $_____ is required |
| | The Termination Date is ___ days after the Effective Date. The Release Conditions are listed in Exhibit B. |
| *(See Article IV)* | |

**Property Management**

| | |
|---|---|
| The Mortgaged Property is: | |
| X | Self-managed by Borrower |
| ☐ | Managed by a Property Manager that is an Affiliate of Borrower |
| ☐ | Managed by a Property Manager that is not an Affiliate of Borrower |
| *The requirements for property management of the Mortgaged Property are detailed in Section 6.09.* | |

**Aluminum Wiring, Galvanized Steel/Polybutylene Piping, Stab-Lok Electric Circuit Breakers**

| | |
|---|---|
| The Mortgaged Property includes (check all that apply): | |
| ☐ | Aluminum wiring |
| ☐ | Galvanized steel/polybutylene piping |
| ☐ | *Stab-Lok* electric circuit breakers |
| *Recourse and other requirements related to these features are detailed in Sections 3.03, 3.04, and 6.09.* | |

**Borrower Entity Requirements and Limitations**

| | |
|---|---|
| Borrower is a(n): | |
| ☐ | Individual |
| ☐ | Revocable Trust |
| X | Single Asset Entity |
| ☐ | Restricted Multiple Asset Entity |
| ☐ | Tenancy in common made up of multiple Co-Borrowers – *See Attached Rider* |
| *The limitations on Single Asset Entities and Restricted Multiple Asset Entities are detailed in Section 6.13.* | |

**O&M Program(s)**

| | | | |
|---|---|---|---|
| Borrower must provide a Moisture Management Plan and each of the O&M Program(s) checked below, the requirements for which are detailed in Section 6.12. | | | |
| X | Asbestos | ☐ | Storage tanks |
| X | Lead-based paint | ☐ | Drinking water |
| ☐ | Radon | ☐ | Prior use of Mortgaged Property |
| X | Polychlorinated Biphenyls (PCBs) | ☐ | Neighborhood waste sites |
| ☐ | Hazardous Materials | ☐ | Other (describe: _____ ) |

**Guarantor(s)**

| | |
|---|---|
| Ruben Guerrero | Rishi Nangalia |
| | |
| | |

**Notices**

| | |
|---|---|
| Addresses for Notices as of the Effective Date are as follows *(See Section 10.03)* | |
| If to Lender: | CBRE CAPITAL MARKETS, INC.<br>929 Gessner Road, Suite 1700, Houston, TX 77024 |
| If to Borrower: | 160 PALISADE REALTY PARTNERS LLC<br>c/o Wilson Soto & Associates, PC, 531 Central Park Avenue, Suite 301, Scarsdale, New York 10583 |

## ARTICLE II   SECURITY AGREEMENT.

2.01    **Uniform Commercial Code Security Agreement.** This Loan Agreement is also a security agreement for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the UCC, for the purpose of securing Borrower's obligations under this Loan Agreement and to further secure Borrower's obligations under the Note, Security Instrument and other Loan Documents,

whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds of the Mortgaged Property (collectively, "**UCC Collateral**"), and by this Loan Agreement, Borrower grants to Lender a security interest under the UCC in the UCC Collateral.

## ARTICLE III   PERSONAL LIABILITY.

**3.01**   **Limited Recourse Generally.** Except as otherwise provided in this Article III, Borrower will have no personal liability under the Note, this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of or compliance with any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of the Indebtedness and the performance of such obligations will be Lender's exercise of its rights and remedies with respect to the Mortgaged Property and to any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability will not limit or impair Lender's enforcement of its rights against any Guarantor.

**3.02**   **Base Recourse.** Borrower will be personally liable to Lender for the Base Recourse specified in Article I ("**Base Recourse**"), plus any other amounts for which Borrower has personal liability under this Article III.

**3.03**   **Loss or Damage Recourse.** Borrower will be personally liable to Lender for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of the occurrence of any of the following events:

    (a)    Borrower fails to complete any of the Priority Repairs (including PR-90 Repairs) identified in the Physical Risk Report.

    (b)    Borrower fails to pay to Lender upon demand after an Event of Default all Rents to which Lender is entitled under Section 3 of the Security Instrument and the amount of all security deposits collected by Borrower from tenants then in residence. This Section 3.03(b) will not apply if Borrower's failure is a result of a valid order issued in bankruptcy, receivership, or a similar judicial proceeding.

    (c)    Borrower fails to apply all Insurance proceeds and Condemnation proceeds as required by this Loan Agreement. This Section 3.03(c) will not apply if Borrower's failure is a result of a valid order issued in bankruptcy, receivership, or a similar judicial proceeding.

    (d)    If an Event of Default has occurred and is continuing, Borrower fails to deliver all Books and Records, contracts, Leases and other instruments relating to the Mortgaged Property or its operation in accordance with the provisions of Section 6.07.

    (e)    Borrower fails to pay when due any of the following:

        (i)    Taxes, if Lender does not collect a Tax Reserve Fund.

        (ii)    Insurance premiums, if Lender does not collect an Insurance Reserve Fund.

        (iii)    Water and sewer charges that could become a lien on the Mortgaged Property.

        (iv)    Assessments or other charges that could become a lien on the Mortgaged Property, including homeowner association dues.

        (v)    Transfer or recording Taxes required to be paid by Borrower.

    (f)    Borrower engages in any willful act of material waste of the Mortgaged Property.

    (g)    Any of the following Transfers occurs:

        (i)    Any Person that is not an Affiliate of Borrower or a Borrower Principal creates a mechanic's lien or other involuntary lien or encumbrance against the Mortgaged Property and Borrower has not complied with the provisions of Article VII.

(ii)    A Transfer by devise, descent or operation of law occurs upon the death of a natural person and such Transfer does not meet Lender's requirements in Article VII.

(iii)    Borrower grants an easement that does not meet Lender's requirements.

(iv)    Borrower executes a Lease that does not meet Lender's requirements.

(h)    If the Mortgaged Property is subject to any oil or gas lease, pipeline agreement, or other instrument related to the production or sale of oil or natural gas that under applicable state law has been given priority over the Security Instrument.

(i)    If the Mortgaged Property is legally non-conforming under the applicable zoning laws, ordinances and/or regulations in the Property Jurisdiction ("**Zoning Code**"), either of the following circumstances occurs following a casualty affecting the Mortgaged Property:

(i)    The Improvements impacted by the casualty cannot be rebuilt or restored to their pre-casualty condition under the terms of the Zoning Code and the Property Insurance proceeds available to Lender under the terms of this Loan Agreement are insufficient to repay the Indebtedness in full.

(ii)    Borrower fails to commence and diligently pursue completion of any Restoration within the time frame required by both the Zoning Code and any permits issued pursuant to the Zoning Code which are necessary to allow the Restoration of the Mortgaged Property to its pre-casualty condition.

(j)    If primary ingress to and egress from the Mortgaged Property is through an easement or private road, any party takes, or threatens to take, any action to deny ingress to or egress from the Mortgaged Property from or to a publicly dedicated and maintained right-of-way.

(k)    If the Mortgaged Property is subject to a Regulatory Agreement restricting rents or occupancy, a default or breach by Borrower (however such terms may be defined in the Regulatory Agreement) extends beyond any applicable notice and/or cure periods under the Regulatory Agreement.

(l)    If the operation of the Mortgaged Property requires that Borrower and its tenants have access to a management office, recreational facility, and/or other amenity that is not located on the Mortgaged Property, and Borrower has entered into an agreement (whether recorded or unrecorded) to ensure such access, any party takes, or threatens to take, any action to deny Borrower and its tenants such access.

(m)    If the Mortgaged Property includes aluminum wiring, galvanized steel/polybutylene piping, or *Stab-Lok* electric circuit breakers, an Aluminum Wiring Event, a Galvanized Steel/PB Piping Event, or a Stab-Lok Event occurs.

**3.04**    **Performance and Cost Recourse.** Borrower will be personally liable to Lender for all of the following:

(a)    The performance of, and the cost to Lender of any nonperformance of, all of Borrower's obligations under each of the following:

(i)    Section 6.14(a) (relating to completion of Priority Repairs (including PR-90 Repairs)).

(ii)    Sections 6.12 and 9.02(b) (relating to environmental matters).

(iii)    Sections 6.09(h), 6.09(i) and 6.09(j) if the Mortgaged Property includes aluminum wiring, galvanized steel/polybutylene piping, or *Stab-Lok* electric circuit breakers.

(b)    The cost to Lender of each of the following:

(i)    Any audit required under Section 6.07.

(ii)     Any expenses incurred in connection with the collection of any amount for which Borrower is personally liable under this Article III, including Attorneys' Fees and Costs and the costs of conducting any independent audit of Borrower's Books and Records to determine the amount for which Borrower has personal liability.

**3.05    Full Recourse.** Borrower will become personally liable to Lender for the repayment of all of the Indebtedness upon the occurrence of any of the following:

(a)     Borrower fails to comply with Section 6.13.

(b)     A Transfer that is an Event of Default under Section 7.02 occurs, other than a Transfer set forth in Section 3.03(g) (for which Borrower will have personal liability for Lender's loss or damage); provided, however, that Borrower will not have any personal liability for a Transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company.

(c)     There was fraud or written material misrepresentation by Borrower or any Affiliate or employee of Borrower in connection with the application for or creation of the Indebtedness or there is fraud in connection with any request by Borrower or Guarantor for any action or consent by Lender.

(d)     A Bankruptcy Event.

**3.06    Exercise of Lender's Rights and Application of Payment.** If Borrower has personal liability under this Article III, then Lender may, to the fullest extent permitted by applicable law, exercise its rights against Borrower personally without regard to whether Lender has exercised any rights against the Mortgaged Property or any other security, or pursued any rights against any Guarantor, or pursued any other rights available to Lender under the Note, this Loan Agreement, any other Loan Document or applicable law. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article III, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability. All payments made by Borrower with respect to the Indebtedness and all amounts received by Lender from the enforcement of its rights under the Loan Documents will be applied first to the portion of the Indebtedness for which Borrower has no personal liability.

## ARTICLE IV    RESERVE FUNDS AND REQUIREMENTS.

**4.01    Reserves Generally.**

(a)     <u>Establishment of Reserve Funds</u>.  Each Reserve Fund marked in Article I as required or collected will be established on the Closing Date and funded in accordance with this Article IV. Upon Notice to Borrower following (i) an Event of Default, (ii) a Transfer requiring Lender's approval under Article VII, or (iii) the placement of a Subordinate Loan, Lender may require Borrower to establish and make deposits into any Reserve Fund marked in Article I as deferred.

(b)     <u>Investment of Reserve Funds</u>.  All Reserve Funds will be deposited in an Eligible Account at an Eligible Institution or invested in "permitted investments" as then defined and required by the Rating Agencies.  Lender will not be obligated to open additional accounts or deposit Reserve Funds in additional institutions when the amount of any Reserve Fund exceeds the maximum amount of the federal deposit insurance or guaranty. Borrower acknowledges and agrees that it will not have the right to direct Lender as to any specific investment of monies in any Reserve Fund.  Lender will not be responsible for any losses resulting from investment of monies in any Reserve Fund or for obtaining any specific level or percentage of earnings on such investment. Unless applicable law requires, Lender will not be required to pay Borrower any interest, earnings or profits on any Reserve Funds.  Any amounts deposited with Lender under this Article IV will not be trust funds, nor will they operate to reduce the Indebtedness, unless applied by Lender for that purpose pursuant to the terms of this Loan Agreement.

(c)     <u>Use of Reserve Funds; No Disbursements during Event of Default</u>.  Each Reserve Fund will, except as otherwise provided in this Loan Agreement, be used for the sole purpose of paying, or reimbursing Borrower for payment of, the item(s) for which the applicable Reserve Fund is

established.  Except as specified in this Loan Agreement, monies in one Reserve Fund will not be used to pay, or reimburse Borrower for, matters for which another Reserve Fund has been established. Lender will not be obligated to make disbursements from any Reserve Fund if any Event of Default has occurred and is continuing. If an Event of Default has occurred and is continuing, then Lender may use any Reserve Fund for the payment or performance of any obligation of Borrower to Lender or otherwise with respect to the Mortgaged Property.

(d)     <u>Termination of Reserve Funds</u>.  Upon payment in full of the Indebtedness, Lender will pay to Borrower all funds remaining in any Reserve Funds.

**4.02    Tax and Insurance Reserves.**

(a)     <u>Deposits</u>. When required by Lender, Borrower will deposit with Lender on the Closing Date and on each Payment Date under the Note an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due, Taxes (**"Tax Reserve Fund"**) and Insurance premiums (**"Insurance Reserve Fund"**).

The amount of each required deposit into the Tax Reserve Fund and Insurance Reserve Fund must be sufficient to enable Lender to pay the Taxes or Insurance premiums, as applicable, before the last date upon which the payment may be made without any penalty or interest charge being added.

(b)     <u>Disbursements</u>.

(i)      Lender will pay Taxes from the Tax Reserve Fund held by Lender upon Lender's receipt of a bill or invoice for Taxes. Lender will have no obligation to pay Taxes to the extent the amount payable exceeds the Tax Reserve Fund then held by Lender. Lender may pay Taxes according to any bill, statement or estimate from the appropriate public office without inquiring into the accuracy of the bill, statement or estimate.

(ii)     Lender will pay Insurance premiums from the Insurance Reserve Fund held by Lender upon Lender's receipt of a bill or invoice for Insurance premiums. Lender will have no obligation to pay Insurance premiums to the extent the amount payable exceeds the Insurance Reserve Fund then held by Lender. Lender may pay Insurance premiums according to any bill, statement or estimate from an insurance company without inquiring into the accuracy of the bill, statement or estimate.

(c)     <u>Adjustments to Reserve Fund Deposits</u>. If at any time the amount of either the Tax Reserve Fund or the Insurance Reserve Fund held by Lender for payment of Taxes or Insurance premiums exceeds the amount reasonably deemed necessary by Lender, then the excess will be credited against future payments into the applicable Reserve Fund. If at any time the amount of either the Tax Reserve Fund or the Insurance Reserve Fund is less than the amount reasonably estimated by Lender to be necessary, then Borrower will pay to Lender the amount of the deficiency within 20 days after Notice from Lender.

(d)     <u>Delivery of Invoices; Proof of Payment by Borrower</u>.  Borrower will promptly deliver to Lender a copy of all notices of, and invoices for, Taxes and Insurance premiums. If Lender has not established a Reserve Fund for either Taxes or Insurance premiums, then on or before the date the Taxes or Insurance premiums are due, Borrower will provide Lender with proof of payment of the Taxes or Insurance premiums.

**4.03    Special Purpose Reserve Fund.**

(a)     <u>Deposit</u>. If a Special Purpose Reserve is required in Article I, then Borrower will pay to Lender on the Closing Date the amount set forth in Article I (**"Special Purpose Reserve Fund"**).

(b)     <u>Disbursements</u>.  Lender will disburse the funds in the Special Purpose Reserve Fund to Borrower when the Release Conditions specified in <u>Exhibit B</u> have been satisfied in Lender's discretion.

(c)     Application of Reserve Funds after the Termination Date. If Borrower has not satisfied the Release Conditions on or before the Termination Date specified in Article I, then Lender may apply some or all of the Special Purpose Reserve Fund to the Indebtedness, and Borrower will pay a prepayment premium computed using the formula set forth in the Note with respect to any such prepayment of principal under the Note. Borrower may not pay the prepayment premium from funds drawn from the Special Purpose Reserve Fund.

**4.04     Capital Replacement and Repair Reserve Fund.**

(a)     Monthly Deposits. If the Capital Replacement and Repair Reserve Monthly Deposit is shown as collected in Article I, then on each Payment Date under the Note, Borrower will pay to Lender the Capital Replacement and Repair Reserve Monthly Deposit amount shown in Article I ("**Capital Replacement and Repair Reserve Fund**").

(b)     Disbursements from Capital Replacement and Repair Reserve Fund.  Lender will disburse funds from the Capital Replacement and Repair Reserve Fund to Borrower for reimbursement of, or to defray the cost of, each of the following, provided the conditions set forth in Sections 4.04(f) and (g) are satisfied:

   (i)     Replacing any of the following:

           Carpet/vinyl flooring, window treatments, roofs, furnaces/boilers, air conditioners, ovens/ranges, refrigerators, dishwashers, water heaters, garbage disposals, and other items that Lender may approve after the Effective Date, subject to any conditions that Lender may require ("**Basic Capital Replacements**," and together with any Additional Capital Replacements listed in Exhibit B, "**Capital Replacements**").

   (ii)    Completing the Priority Repairs described in the Physical Risk Report, provided a Repair Deposit is required in Article I.

(c)     Additional Capital Replacements Deposit.  If an Additional Capital Replacements Deposit is required in Article I, then on the Closing Date, Borrower will pay the Additional Capital Replacements Deposit to Lender for deposit into the Capital Replacement and Repair Reserve Fund. The Additional Capital Replacements Deposit will be available to reimburse Borrower only for reimbursement of, or to defray, the cost of the Additional Capital Replacements listed in Exhibit B.

        Borrower may not displace or relocate tenants to undertake or complete the Additional Capital Replacements unless such displacement or relocation has been approved by Lender. Borrower must complete the Additional Capital Replacements on or before the Additional Capital Replacements Completion Date specified in Article I, as may be extended by Lender in its discretion. Any funds from the Additional Capital Replacements Deposit remaining in the Capital Replacement and Repair Reserve Fund after the Additional Capital Replacements are completed in a manner satisfactory to Lender will be returned to Borrower.

(d)     Repair Deposit.  If a Repair Deposit is required in Article I, then on the Closing Date, Borrower will pay the Repair Deposit to Lender for deposit into the Capital Replacement and Repair Reserve Fund.  The Repair Deposit will be available to reimburse Borrower only for reimbursement of, or to defray, the cost of Priority Repairs (including PR-90 Repairs). Any funds from the Repair Deposit remaining in the Capital Replacement and Repair Reserve Fund after all of the Priority Repairs are completed in a manner satisfactory to Lender will be returned to Borrower.

(e)     Insufficient Amount in Capital Replacement and Repair Reserve Fund. If Borrower requests disbursement from the Capital Replacement and Repair Reserve Fund for a Capital Replacement or a Priority Repair (including PR-90 Repairs) in an amount that exceeds the amount on deposit in the Capital Replacement and Repair Reserve Fund, then Lender will disburse to Borrower only the amount on deposit in the Capital Replacement and Repair Reserve Fund.  Borrower will pay all additional amounts required in connection with any such Capital Replacement or Priority Repair from Borrower's own funds.

(f)   <u>Limits on Disbursements</u>.  Lender will disburse funds from the Capital Replacement and Repair Reserve Fund no more frequently than once per calendar month, and no disbursement will be made in an amount less than $1,000.

(g)   <u>Performance of Capital Replacements and Priority Repairs (including PR-90 Repairs);</u>
      <u>Requests for Disbursement</u>.

      (i)    If Borrower determines that a Capital Replacement is necessary or desirable, then Borrower will perform such Capital Replacement and request from Lender, in writing, reimbursement for the cost of such Capital Replacement from the Capital Replacement and Repair Reserve Fund using the Disbursement Request attached to this Loan Agreement as <u>Exhibit A</u>. The Disbursement Request must be accompanied by paid invoices or bills that show Borrower has paid for the applicable Capital Replacement.

      (ii)   Borrower must complete all Priority Repairs (including PR-90 Repairs) pursuant to Section 6.14. After Borrower performs one or more Priority Repairs, Borrower may request from Lender reimbursement for the cost of such Priority Repair(s) from the Capital Replacement and Repair Reserve Fund using the Disbursement Request attached to this Loan Agreement as Exhibit A. The Disbursement Request must be accompanied by paid invoices or bills that show Borrower has paid for the applicable Priority Repair.

      (iii)  If requested by Lender, Borrower must provide any other information, documents, lien waivers, certifications, or professional engineering reports regarding the work and the cost of such Capital Replacements or Priority Repairs. Lender, at its option, may retain a professional inspection engineer or other qualified third party to inspect any Capital Replacement or Priority Repair. If Lender retains such a third party, then it will charge Borrower an amount sufficient to pay all reasonable costs and expenses charged by such third party inspector. Lender may, at its election, either deduct such cost from the Capital Replacement and Repair Reserve Fund or send Borrower a Notice of the amount of such charge, which Borrower must pay within 20 days following its receipt of such Notice.

      (iv)   If Lender reasonably determines at any time that a Capital Replacement or a Repair is necessary for the proper maintenance of the Mortgaged Property, then Lender will give Notice to Borrower requesting that Borrower obtain and submit to Lender bids for all labor and materials required in connection with such Capital Replacement or Repair.  In response, Borrower will submit such bids and a time schedule for completing each Capital Replacement or Repair to Lender within 30 days after Borrower's receipt of Lender's Notice.  Borrower will perform such Capital Replacement or Repair in conformity with the requirements of this Section 4.04 and then may request reimbursement for such Capital Replacement or Repair in accordance with this Section 4.04.

(h)   <u>Adjustments to Reserve Fund Deposits</u>. If the initial term of the Loan is greater than 120 months, then following each of the 120th and 180th Payment Dates under the Note, Lender may adjust the amount of the Capital Replacement and Repair Reserve Monthly Deposit based on Lender's most recent assessment of the physical condition of the Mortgaged Property and will provide Borrower Notice of this revised Capital Replacement and Repair Reserve Monthly Deposit amount. Borrower will begin paying this revised Capital Replacement and Repair Reserve Monthly Deposit on the next Payment Date following its receipt of the Notice from Lender.

## ARTICLE V   REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Lender as follows as of the Effective Date:

**5.01   Review of Documents.**  Borrower has reviewed: (a) the Physical Risk Report, (b) the Commitment Letter (c) the Note, (d) this Loan Agreement, (e) the Security Instrument, and (f) all other Loan Documents.

**5.02   Condition of Mortgaged Property.**   Except as Borrower may have disclosed to Lender in writing in connection with the issuance of the Commitment Letter (which written disclosure may be in certain written reports accepted by Lender in connection with the funding of the Indebtedness and dated prior to the

Effective Date), the Mortgaged Property has not been damaged by fire, water, wind or other cause of loss, or, if so damaged, any previous damage to the Mortgaged Property has been fully restored.

**5.03    No Condemnation.** No part of the Mortgaged Property has been taken in Condemnation or other similar proceeding, and, to the best of Borrower's knowledge after due inquiry and investigation, no such proceeding is pending or threatened for the partial or total Condemnation or other taking of the Mortgaged Property.

**5.04    Actions; Suits; Proceedings.** There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of Borrower's knowledge, threatened in writing against or affecting Borrower, any Borrower Principal, or the Mortgaged Property which, if adversely determined, would have a Material Adverse Effect.

**5.05    Environmental.** Except as previously disclosed by Borrower to Lender in writing (which written disclosure may be in certain environmental assessments and other written reports accepted by Lender in connection with the funding of the Indebtedness and dated prior to the Effective Date), each of the following is true:

(a)    Borrower has not at any time engaged in, caused, or permitted any Prohibited Activities or Conditions on the Mortgaged Property.

(b)    To the best of Borrower's knowledge after due inquiry and investigation, no Prohibited Activities or Conditions exist or have existed on the Mortgaged Property.

(c)    The Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after due inquiry and investigation, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws.

(d)    To the best of Borrower's knowledge after due inquiry and investigation, Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. All Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect have been obtained and all such Environmental Permits are in full force and effect.

(e)    To the best of Borrower's knowledge after due inquiry and investigation, no event has occurred with respect to the Mortgaged Property that constitutes, or with the passage of time or the giving of notice, or both, would constitute, noncompliance with the terms of any Environmental Permit.

(f)    There are no actions, suits, claims, or proceedings pending or, to the best of Borrower's knowledge after due inquiry and investigation, threatened in writing, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition.

(g)    Borrower has received no actual or constructive notice of any written complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any property that is adjacent to the Mortgaged Property.

**5.06    No Labor or Materialmen's Claims.** Borrower represents and warrants that all parties furnishing labor and materials for which a Lien or claim of Lien may be filed against the Mortgaged Property have been paid in full and, except for such Liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmen's Liens or claims outstanding for work, labor or materials affecting the Mortgaged Property, whether prior to, equal with or subordinate to the Lien of the Security Instrument.

**5.07    Compliance with Applicable Laws and Regulations.** To the best of Borrower's knowledge after due inquiry and investigation, each of the following is true:

(a)     All Improvements and the use of the Mortgaged Property comply with all applicable statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning, and land use ("legal non-conforming" status with respect to uses or structures will be considered to comply with zoning and land use requirements for the purposes of this representation).

(b)     The Improvements comply with applicable health, fire, and building codes.

(c)     There is no evidence of any illegal activities relating to controlled substances on the Mortgaged Property.

**5.08     Access; Utilities; Tax Parcels.**  The Mortgaged Property: (a) has ingress and egress via a publicly dedicated right of way or via an irrevocable easement permitting ingress and egress, (b) is served by public utilities and services generally available in the surrounding community or otherwise appropriate for the current use of the Mortgaged Property, and (c) constitutes one or more separate tax parcels.

**5.09     Licenses and Permits.**  Borrower, each commercial tenant of the Mortgaged Property, and/or any operator of the Mortgaged Property is in possession of all material licenses, permits and authorizations required for use of the Mortgaged Property, which are valid and in full force and effect as of the Effective Date.

**5.10     No Other Interests.**  To the best of Borrower's knowledge after due inquiry and investigation, no Person has (a) any possessory interest in the Mortgaged Property or right to occupy the Mortgaged Property except under the provisions of existing Leases by and between tenants and Borrower, or (b) an option to purchase the Mortgaged Property or an interest in the Mortgaged Property, except as has been disclosed to and approved in writing by Lender.

**5.11     Term of Leases.**  Unless otherwise approved in writing by Lender, all Leases for residential dwelling units with respect to the Mortgaged Property are on forms acceptable to Lender, are for initial terms of at least 6 months and not more than 2 years, and do not include options to purchase; provided, however, that up to 20% of all Leases may be for an initial term of less than 6 months, but not less than 1 month.

**5.12     No Prior Assignment; Prepayment of Rents.**  Borrower has (a) not executed any prior assignment of Rents (other than an assignment of Rents securing any prior indebtedness that is being assigned to Lender or that is being paid off and discharged with the proceeds of the Loan), and (b) not performed any acts and has not executed, and will not execute, any instrument which would prevent Lender from exercising its rights under any Loan Document.  At the time of execution of this Loan Agreement, unless otherwise approved by Lender in writing, there has been no prepayment of any Rents for more than 2 months prior to the due dates of such Rents.

**5.13     Illegal Activity.**  No portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**5.14     Taxes Paid.**  Borrower has filed all federal, state, county, and municipal tax returns required to have been filed by Borrower, and has paid all Taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessments with respect to such Taxes.  To the best of Borrower's knowledge after due inquiry and investigation, there are not presently pending any special assessments against the Mortgaged Property or any part of the Mortgaged Property.

**5.15     Title Exceptions.**  To the best of Borrower's knowledge after due inquiry and investigation, none of the items shown in the schedule of exceptions to coverage in the title insurance policy issued to and accepted by Lender contemporaneously with the execution of this Loan Agreement and insuring Lender's interest in the Mortgaged Property ("**Permitted Encumbrances**") will have a Material Adverse Effect on the:  (a) ability of Borrower to pay the Loan in full, (b) ability of Borrower to use all or any part of the Mortgaged Property in the manner in which the Mortgaged Property is being used on the Effective Date, (c) operation of the Mortgaged Property, or (d) value of the Mortgaged Property.

**5.16    No Change in Facts or Circumstances.**

(a)    All information in the application for the Loan submitted to Lender, including all financial statements for the Mortgaged Property, Borrower, and any Borrower Principal, and all Rent Schedules, reports, certificates, and any other documents submitted in connection with the application (collectively, "**Loan Application**") is complete and accurate in all material respects as of the date such information was submitted to Lender.

(b)    There has been no change in any fact or circumstance since the Loan Application was submitted to Lender that would make any information submitted as part of the Loan Application materially incomplete or inaccurate.

**5.17    ERISA – Borrower Status.**

(a)    Borrower is not an "investment company," or a company under the Control of an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(b)    Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA or a "plan" to which Section 4975 of the Tax Code applies, and the assets of Borrower do not constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

(c)    Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and is not subject to state statutes regulating investments or fiduciary obligations with respect to governmental plans.

**5.18    No Fraudulent Transfer or Preference.**  No Borrower or Borrower Principal has taken or will take any of the following actions:

(a)    Transfer of an interest in the property of Borrower or Borrower Principal to or for the benefit of Lender or otherwise as security for any of the obligations under the Loan Documents which is or could constitute a voidable preference under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

(b)    Transfer of (including any Transfer to or for the benefit of an insider under an employment contract) an interest of Borrower or any Borrower Principal in property which is or could constitute a voidable preference under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

(c)    Incur any obligation (including any obligation to or for the benefit of an insider under an employment contract) which is or could constitute a fraudulent transfer under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

**5.19    No Insolvency or Judgment.**

(a)    No Borrower or Borrower Principal is (i) the subject of or a party to (other than as a creditor) any completed or pending bankruptcy, reorganization or insolvency proceeding, or (ii) the subject of any unsatisfied judgment that is of record or docketed in any court located in the United States.

(b)    Borrower is not presently insolvent, and the Loan will not render Borrower insolvent.  As used in this Section 5.19, the term "**insolvent**" means that the total of all of a Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of the assets of the Person that are available to satisfy claims of creditors.

**5.20    Working Capital.**  After the Loan is made, Borrower intends to have sufficient working capital, including cash flow from the Mortgaged Property or other sources, to (a) adequately maintain the Mortgaged Property, and (b) to pay all of Borrower's outstanding debts as they come due (other than any balloon payment due upon the maturity of the Loan).  Lender acknowledges that no members or partners of

Borrower or any Borrower Principal will be obligated to contribute equity to Borrower for purposes of providing working capital to maintain the Mortgaged Property or to pay Borrower's outstanding debts except as may otherwise be required under their organizational documents.

5.21   **Regulatory Agreement.** If the Mortgaged Property is subject to one or more Regulatory Agreements, Borrower represents and warrants that all of the following are correct as to each applicable Regulatory Agreement:

(a)   Borrower is in compliance with all requirements of the Regulatory Agreement. Borrower has not received any notice from the party or parties responsible for monitoring or enforcing the Regulatory Agreement that Borrower is in default under the Regulatory Agreement.

(b)   The copy of the Regulatory Agreement that Borrower has provided to Lender includes all amendments, schedules and exhibits and is complete and accurate in all respects.

(c)   Unless otherwise approved by Lender in writing, the Regulatory Agreement by its terms terminates upon foreclosure under the Security Instrument or upon a transfer of the Mortgaged Property by instrument in lieu of foreclosure.

5.22   **Commercial Purpose; No Right to Residency.** Borrower represents that Borrower is incurring the Indebtedness solely for the purpose of carrying on a business or commercial enterprise, and not for consumer, personal, family, household or agricultural purposes. If Borrower is a natural person, he/she waives any right to residency at the Mortgaged Property.

5.23   **Prohibited Parties Lists; Economic Sanctions Laws.** To the best of Borrower's knowledge, after due inquiry and investigation, none of (a) Borrower, (b) any Borrower Principal, (c) any Person with a collective equity interest (whether direct or indirect) in Borrower of 25% or more, or (d) any Non-U.S. Equity Holder, is presently listed or at any time has been listed on any Prohibited Parties List.

5.24   **Survival.** The representations and warranties set forth in this Loan Agreement will survive until the Indebtedness is paid in full; however, the representations and warranties set forth in Section 5.05 will survive beyond repayment of the entire Indebtedness, as provided in Sections 9.02(b) and 9.02(h).

## ARTICLE VI    BORROWER COVENANTS.

6.01   **Compliance with Laws.** Borrower will at all times comply with all laws, ordinances, rules, regulations, and requirements of any Governmental Authority having jurisdiction over the Mortgaged Property and with the terms of all licenses and permits and all recorded covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements, and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, Repairs, Capital Replacements, fair housing, disability accommodation, zoning and land use, applicable building codes, special use permits, environmental regulations, Leases, and the maintenance and disposition of tenant security deposits. Borrower will at all times take appropriate measures to prevent, and will not engage in or knowingly permit, any illegal activities at or on the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the Lien created by the Security Instrument or Lender's interest in the Mortgaged Property. Borrower will at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.01.

6.02   **Compliance with Organizational Documents (Entity Borrowers).**

(a)   This Section 6.02 will not apply to any Borrower who is a natural person.

(b)   Borrower will at all times comply with all laws, regulations and requirements of any Governmental Authority relating to Borrower's formation, continued existence and good standing in its state of formation and, if different, in the Property Jurisdiction. Borrower will at all times comply with its organizational documents. If Borrower is a housing cooperative corporation or association, then Borrower will at all times maintain its status as a "cooperative housing corporation" as such term

is defined in Section 216(b) of the Internal Revenue Code of 1986, as amended, or any successor statute.

6.03    **Use of Mortgaged Property.** Unless required by applicable law, without the prior written consent of Lender, Borrower will not take any of the following actions:

(a)    Allow changes in the use for which all or any part of the Mortgaged Property is being used as of the Effective Date.

(b)    Initiate or acquiesce to a change in the zoning classification of the Mortgaged Property.

(c)    Establish any condominium or cooperative regime with respect to the Mortgaged Property beyond any that may be in existence on the Effective Date.

(d)    Combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property.

(e)    Subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property.

(f)    Add to or change any location at which any of the Mortgaged Property is stored, held or located unless Borrower (A) gives Notice to Lender within 30 days after the occurrence of such addition or change, (B) executes and delivers to Lender any modifications of or supplements to this Loan Agreement that Lender may require, and (C) authorizes the filing of any financing statement or amendment which may be filed in connection with this Loan Agreement, as Lender may require.

6.04    **Non-Residential Leases.**  Borrower will not enter into any new Non-Residential Lease, or modify or terminate any existing Non-Residential Lease (except for extending an existing Non-Residential Lease on identical terms) without the prior written consent of Lender.

6.05    **Prepayment of Rents.**  Borrower will not receive or accept Rent under any Lease (whether a residential Lease or a Non-Residential Lease) for more than 2 months in advance.

6.06    **Inspection.**  Borrower authorizes Lender and its agents, representatives, and designees to enter, at any reasonable time and subject to applicable law (including applicable law with respect to the rights of tenants), any portion of the Mortgaged Property to inspect, attend to Lender's interests, and perform any of the acts that Lender is authorized to perform pursuant to the Loan Documents, including with respect to Restoration, Repairs, and Capital Replacements.

6.07    **Books and Records; Financial Reporting.**

(a)    <u>Maintenance of Books and Records</u>.

(i)    Borrower will keep and maintain at all times at the Mortgaged Property or Property Manager's office, and upon Lender's request will make available at the Mortgaged Property (or, at Borrower's option, at Property Manager's office), complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property ("**Books and Records**").

(ii)    The Books and Records will be kept in accordance with one of the following accounting methods, consistently applied, and Borrower will promptly provide Lender Notice of any change in Borrower's accounting methods:

(A)    GAAP, or generally accepted accounting principles.

(B)    Tax method of accounting, provided that under the tax method of accounting, the accrual basis may be used for interest expense, real estate taxes and insurance expense, and the cash basis will be used for all other items, including income,

prepaid rent, utilities and payroll expense. Financial statements may exclude depreciation and amortization.

      (C)     Such other method that is acceptable to Lender.

    (iii)    The Books and Records will be subject to examination and inspection by Lender at any reasonable time with or without prior Notice to Borrower.

(b)    <u>Delivery of Borrower Financial Information – Annual Requirements</u>. Within 90 days after the end of each calendar year (or the end of Borrower's fiscal year, if Borrower has adopted fiscal year financial reporting), Borrower will deliver all of the following to Lender:

    (i)    A Rent Schedule dated no earlier than the date that is 5 days prior to the end of such year.

    (ii)    An annual statement of income and expenses for Borrower's operation of the Mortgaged Property.

    (iii)    If the Mortgaged Property is subject to one or more Regulatory Agreements, evidence that the Mortgaged Property is in ongoing compliance with all income, occupancy and rent restrictions under the Regulatory Agreement(s).

(c)    <u>Delivery of Borrower Financial Information – Mid-Year Requirement</u>. Within 25 days after the end of the second calendar quarter each year (or the end of the second quarter of Borrower's fiscal year, if Borrower has adopted fiscal year financial reporting), Borrower will deliver to Lender a Rent Schedule dated no earlier than the date that is 5 days prior to the end of such quarter.

(d)    <u>Delivery of Borrower Financial Information – When Requested by Lender</u>. Within 25 days following a Notice from Lender including a request for such information, Borrower will deliver the following to Lender:

    (i)    The Rent Schedule for any period specified by Lender.

    (ii)    A statement of income and expenses for Borrower's operation of the Mortgaged Property for the period specified by Lender.

    (iii)    A balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the date specified by Lender.

    (iv)    An accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts.

    (v)    A property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants for any period specified by Lender.

    (vi)    Copies of Borrower's state and federal tax returns, including current tax return extensions.

    (vii)    Written updates on the status of all litigation proceedings that were disclosed or should have been disclosed by Borrower to Lender either (A) as of the Effective Date or (B) during the term of the Loan pursuant to Section 6.16.

    (viii)    A statement that identifies all owners of any direct interest in Borrower and any Person(s) that Control(s) Borrower  (except that the statement need not identify the owners of a publicly-traded entity). The statement must identify the percentage and type of ownership

or Control interest held by each Person and must also identify any Non-U.S. Equity Holders.

(ix) Such other financial information or property management information as Lender may require (including information on tenants under Leases if such information is available to Borrower and copies of bank account statements from financial institutions where funds owned or controlled by Borrower are maintained).

(e) <u>Delivery of Guarantor Financial Information – When Requested by Lender</u>. Within 25 days following a Notice from Lender including a request for such information, Borrower will cause Guarantor to deliver the following to Lender:

(i) Guarantor's balance sheet and profit and loss statement as of the date specified by Lender.

(ii) Other Guarantor financial statements as Lender may reasonably require.

(iii) Written updates on the status of all litigation proceedings that Guarantor disclosed or should have disclosed to Lender as of the Effective Date.

(iv) If an Event of Default has occurred and is continuing, copies of Guarantor's state and federal tax returns, including current tax return extensions.

(f) <u>Delivery of General Partner Financial Statements – When Requested by Lender</u>. If Borrower is a general partnership, then within 25 days following a Notice from Lender including a request for such information, Borrower will cause each of its general partners to deliver the following to Lender:

(i) The general partner's balance sheet and profit and loss statement as of the date specified by Lender.

(ii) Other general partner financial statements as Lender may reasonably require.

(iii) Written updates on the status of all litigation proceedings that the general partner disclosed or should have disclosed to Lender as of the Effective Date.

(iv) If an Event of Default has occurred and is continuing, copies of the general partner's state and federal tax returns, including current tax return extensions.

(g) <u>Certification of Statements; Audited Financials</u>. A natural person having authority to bind Borrower, Guarantor, or the general partner of Borrower, as applicable, will certify each of the statements, schedules and reports required by Sections 6.07(b)-(f) to be complete and accurate. Each of the statements, schedules and reports required by Sections 6.07(b)-(f) will be in such form and contain such detail as Lender may reasonably require. At any time when an Event of Default has occurred and is continuing, or at any time that Lender determines that audited financial statements are required for an accurate assessment of the financial condition of Borrower or the Mortgaged Property, Lender also may require that any of the statements, schedules or reports listed in Sections 6.07(b)-(f) be audited at Borrower's expense by an independent certified public accountant acceptable to Lender.

(h) <u>Failure to Timely Provide Financial Statements</u>. If Borrower fails to provide in a timely manner the statements, schedules and reports required by Sections 6.07(b)-(f), then Lender will give Notice to Borrower specifying the statements, schedules and reports required by Sections 6.07(b)-(f) that Borrower has failed to provide. If Borrower has not provided the required statements, schedules and reports within 10 Business Days following such Notice, then (i) Borrower will pay a late fee of $500 for each late statement, schedule or report, plus an additional $500 per month that any such statement, schedule or report continues to be late, and (ii) Lender will have the right to have Borrower's Books and Records audited, at Borrower's expense, by an

independent certified public accountant by an independent certified public accountant acceptable to Lender.

(i) <u>Reporting Upon Event of Default</u>. If an Event of Default has occurred and is continuing, then Borrower will deliver to Lender upon written demand all Books and Records and other instruments that affect the Mortgaged Property.

(j) <u>Credit Reports</u>. Borrower authorizes Lender to obtain a credit report on Borrower, and if Borrower is a general partnership, on any of its general partners, at any time.

**6.08 Taxes; Operating Expenses.**

(a) <u>Payment of Taxes</u>. Subject to the provisions of Section 6.08(c), Borrower will pay or cause to be paid all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b) <u>Payment of Operating Expenses and Insurance Premiums</u>. Subject to the provisions of Section 6.08(d), Borrower will (i) pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including utilities, Repairs and Capital Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added, and (ii) pay Insurance premiums at least 30 days prior to the expiration date of each policy of Insurance, unless applicable law specifies some lesser period.

(c) <u>Payment of Taxes and Reserve Funds</u>. If Lender is collecting Tax Reserves pursuant to Article IV, then so long as no Event of Default exists, Borrower will not be obligated to pay Taxes, but only if Lender holds sufficient Tax Reserves and Borrower has timely delivered to Lender any bills or notices that it has received with respect to Taxes. Lender will have no liability to Borrower for failing to pay any Taxes if any of the following conditions exist: (i) any Event of Default has occurred and is continuing, (ii) Lender holds insufficient Tax Reserves at the time a Tax becomes due and payable, or (iii) Borrower has failed to provide Lender with bills and notices as provided in this Section 6.08.

(d) <u>Payment of Insurance and Reserve Funds</u>. If Lender is collecting Insurance Reserves pursuant to Article IV, then so long as no Event of Default exists, Borrower will not be obligated to pay Insurance premiums but only if Lender holds sufficient Insurance Reserve Deposits and Borrower has timely delivered to Lender any bills or premium notices that it has received with respect to Insurance premiums. Lender will have no liability to Borrower for failing to pay any Insurance premiums if any of the following conditions exist: (i) any Event of Default has occurred and is continuing, (ii) Lender holds insufficient Insurance Reserve Deposits at the time an Insurance premium becomes due and payable, or (iii) Borrower has failed to provide Lender with bills and premium notices as provided in this Section 6.08.

(e) <u>Right to Contest</u>. Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of Taxes, if:  (i) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (ii) the Mortgaged Property is not in danger of being sold or forfeited, (iii) if Borrower has not already paid the Taxes, Borrower deposits with Lender reserves sufficient to pay the contested Taxes, if requested by Lender, and (iv) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of reserves established by Borrower to pay the contested Taxes.

**6.09 Preservation, Management, and Maintenance of Mortgaged Property.**

(a) <u>Maintenance of Mortgaged Property; No Waste</u>. Borrower will keep the Mortgaged Property in good repair, including replacing Personalty and Fixtures with items of equal or better function and quality. Borrower will not commit waste or permit impairment or deterioration of the Mortgaged Property.

(b) <u>Abandonment of Mortgaged Property</u>. Borrower will not abandon the Mortgaged Property.

(c)    <u>Defense of Mortgaged Property</u>. Borrower will give Notice to Lender of and, unless otherwise directed in writing by Lender, will appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement.

(d)    <u>Preservation of Mortgaged Property</u>. Borrower will promptly restore or repair, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not Insurance proceeds or Condemnation awards are available to cover any costs of such Restoration or Repair; provided, however, that Borrower will not be obligated to perform such Restoration or Repair if (i) no Event of Default has occurred and is continuing, and (ii) Lender has elected to apply any available Insurance proceeds and/or Condemnation awards to the payment of Indebtedness pursuant to Section 6.10(j) or Section 6.11(b).

(e)    <u>Limits on Alteration of Mortgaged Property</u>. Without the prior written consent of Lender, Borrower will not take any of the following actions (or permit any tenant or other Person to take any of the following actions):

    (i)    Convert any residential dwelling unit or common area to non-residential use.

    (ii)    Convert any non-residential unit or common area to residential use.

    (iii)    Convert, in whole or in part, any income producing unit to a non-income producing unit.

    (iv)    Displace or relocate more than 20% of tenants to undertake or complete any Capital Replacements, Repairs or other alterations or rehabilitation of the Mortgaged Property, unless such displacement or relocation is required by law.

    (v)    Remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property, including any removal, demolition, or alteration occurring in connection with a rehabilitation of all or part of the Mortgaged Property, except that each of the following is permitted:

        (A)    Repairs and Capital Replacements.

        (B)    Replacement of tangible Personalty.

        (C)    Making an individual unit ready for a new occupant.

        (D)    Preservation and maintenance of the Mortgaged Property in accordance with Sections 6.09(a) and (d).

        (E)    If Borrower is a cooperative housing corporation or association, removal, demolition, or alteration of the Mortgaged Property as permitted with respect to individual dwelling units under the form of a proprietary lease or occupancy agreement.

(f)    <u>Establishment of MMP</u>. Unless otherwise waived by Lender in writing, Borrower will have, or will establish, and will adhere to the MMP. If Borrower is required to have an MMP, then Borrower will keep all MMP documentation at the Mortgaged Property or at Property Manager's office and available for review by Lender or the Loan Servicer during any annual assessment or other inspection of the Mortgaged Property that is required by Lender. At a minimum, the MMP must contain provisions for: (i) staff training, (ii) information to be provided to tenants, (iii) documentation of the plan, (iv) the appropriate protocol for incident response and remediation, and (v) routine, scheduled inspections of common space and unit interiors.

(g)    <u>Inspection of Mold</u>. If Lender determines that Mold has or may have developed as a result of a water intrusion event or leak, then Lender may require that a professional inspector inspect the Mortgaged Property to confirm whether Mold has developed and, if so, thereafter as frequently as

Lender determines is necessary until any issue with Mold and its cause(s) are resolved to Lender's satisfaction. Such inspection will be limited to a visual and olfactory inspection of the area that has experienced the Mold, water intrusion event or leak. Borrower will be responsible for the cost of each such professional inspection and any remediation deemed to be necessary as a result of the professional inspection.

(h)     Aluminum Wiring. If the Mortgaged Property includes aluminum wiring, then Borrower will give prompt Notice to Lender of any malfunction or fire associated with, or resulting from, the existence of any aluminum wiring located on the Mortgaged Property ("**Aluminum Wiring Event**"). In addition to any Restoration of the Mortgaged Property required as a result of the Aluminum Wiring Event, following the Aluminum Wiring Event, Borrower will complete each of the following Repairs:

   (i)     Replace all aluminum wiring associated with the Aluminum Wiring Event with building code compliant copper wiring within 30 days following the Aluminum Wiring Event or as otherwise required by Lender.

   (ii)    Replace all remaining aluminum wiring located in each building affected by the Aluminum Wiring Event with building code compliant copper wiring within 1 year following the Aluminum Wiring Event or as otherwise required by Lender.

(i)     Galvanized Steel or Polybutylene Piping. If the Mortgaged Property contains galvanized steel piping and/or polybutylene piping, then Borrower will give prompt Notice to Lender of any leaks in or other failure of the galvanized steel/polybutylene piping located on the Mortgaged Property ("**Galvanized Steel/PB Piping Event**"). In addition to any Restoration of the Mortgaged Property required as a result of the Galvanized Steel/PB Piping Event, following the Galvanized Steel/PB Piping Event, Borrower will complete each of the following Repairs:

   (i)     Replace all galvanized steel/polybutylene piping associated with the Galvanized Steel/PB Piping Event with building code compliant copper, PVC or CPVC piping within 30 days following the Galvanized Steel/PB Piping Event or as otherwise required by Lender.

   (ii)    Replace all remaining galvanized steel/polybutylene piping located in each building affected by the Galvanized Steel/PB Piping Event with building code compliant copper, PVC or CPVC piping within 1 year following the Galvanized Steel/PB Piping Event or as otherwise required by Lender.

(j)     *Stab-Lok* Circuit Breakers. If the Mortgaged Property includes *Stab-Lok* electric circuit breakers, then Borrower will give prompt Notice to Lender of any malfunction or fire associated with, or resulting from, the existence of any of the *Stab-Lok* electric circuit breakers located on the Mortgaged Property ("**Stab-Lok Event**"). In addition to any Restoration of the Mortgaged Property required as a result of the Stab-Lok Event, following the Stab-Lok Event, Borrower will complete each of the following Repairs:

   (i)     Replace all *Stab-Lok* electric circuit breakers associated with each Stab-Lok Event with building code compliant electric circuit breakers within 30 days following the Stab-Lok Event or as otherwise required by Lender.

   (ii)    Replace all remaining *Stab-Lok* electric circuit breakers located in the building affected by the Stab-Lok Event with building code compliant electric circuit breakers within 1 year following the Stab-Lok Event or as otherwise required by Lender.

(k)     No Reduction of Housing Cooperative Charges. If Borrower is a housing cooperative corporation or association, then until the Indebtedness is paid in full, Borrower will not reduce the maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements below a level which is sufficient to pay all expenses of Borrower, including all operating and other expenses for the Mortgaged Property and all payments due pursuant to the terms of the Note and any Loan Documents.

(l)    Property Management.

(i)    As of the Effective Date, the Mortgaged Property is managed as shown in Article I. Borrower will not change the property management structure or the identity of the Property Manager (if applicable) without Lender's prior consent.

(ii)   During any period in which Borrower self-manages the Mortgaged Property, Borrower will not engage or pay any other Person (whether an Affiliate of Borrower or otherwise) a fee or other compensation for managing the Mortgaged Property.

(iii)  During any period in which Borrower engages a Property Manager (whether an Affiliate of the Borrower or otherwise), all of the following are applicable:

(A)   Borrower will maintain a written property management agreement with the Property Manager, and that agreement will be terminable by Borrower with no more than 30 days' Notice to the Property Manager. Borrower's right to terminate the property management agreement will not require Borrower to show cause for the termination or pay the Property Manager a penalty or fee.

(B)   Borrower will provide a copy of the property management agreement and any renewals or modifications of the property management agreement to Lender.

(C)   Without Lender's prior consent, Borrower will not cancel or modify the property management agreement, except that Borrower and Property Manager may renew the property management agreement on identical terms.

(iv)   If at any time, Lender determines that the Mortgaged Property is not being managed in accordance with generally accepted management practices for properties similar to the Mortgaged Property, then Lender may require that Borrower terminate any existing property management agreement or cease to self-manage the Mortgaged Property and engage a Property Manager satisfactory to Lender.

**6.10   Insurance.**

(a)    Insurance Covenant.  Borrower will at all times during the term of this Loan Agreement maintain, at its sole expense, for the mutual benefit of Borrower and Lender, Insurance as required by Lender and applicable law, with such endorsements as Lender may reasonably require from time to time and which are customarily required by institutional lenders for properties comparable to the Mortgaged Property.

(b)    Property Insurance.  Borrower will maintain Insurance against relevant physical hazards that may cause damage to the Mortgaged Property, which Insurance may include coverage against loss or damage from fire, wind, hail, and other related perils within the scope of a "Special Causes of Loss" policy form, general boiler and machinery, business income, flood (if any of the Improvements are located in an area identified by the Federal Emergency Management Agency, or any successor to that agency, as a "Special Flood Hazard Area") and windstorm and/or windstorm related perils (collectively, **"Property Insurance"**).  Property Insurance may also include coverage for ordinance or law (if the Mortgaged Property does not conform with applicable building, zoning or land use laws, rules or regulations), earthquake, terrorism, sinkhole, mine subsidence, avalanche, mudslide and volcanic eruption.

(c)    Liability Insurance.  Borrower will maintain commercial general liability Insurance, which may include workers' compensation Insurance, and such other liability, errors and omissions, and fidelity Insurance coverage.

(d)    Builder's Risk.  During any period of construction or Restoration, Borrower will maintain builder's risk Insurance, including fire and other perils within the scope of a policy known as "Causes of Loss – Special Form" or "All Risk" policy.

(e)   Payment of Premiums.  All premiums for Insurance required under this Section 6.10 will be paid in the manner provided in Article IV and Section 6.08, unless Lender has designated in writing another method of payment.

(f)   Policy Requirements.  The following requirements apply with respect to all Insurance required by this Section 6.10:

    (i)   All Insurance policies will be in a form and with the terms required by Lender.

    (ii)   All Property Insurance policies will contain a standard mortgagee or mortgage holder's clause and a loss payable clause, in favor of, and in a form approved by, Lender.

    (iii)   All commercial general liability and excess umbrella liability policies will name Lender and its successors and assigns as an additional insured party.

    (iv)   All Property Insurance policies will provide that the insurer will notify Lender in writing of cancellation of policies at least 10 days before the cancellation of the policy by the insurer for nonpayment of the premium or nonrenewal and at least 30 days before cancellation by the insurer for any other reason.

(g)   Evidence of Insurance; Insurance Policy Renewals.  Borrower will deliver to Lender a legible copy of each Insurance policy, and Borrower will promptly deliver to Lender a copy of all renewal, nonrenewal, cancellation, and other notices received by Borrower with respect to the policies. Borrower will ensure that the Mortgaged Property is continuously covered by the required Insurance.  At least 5 days prior to the expiration date of each Insurance policy, Borrower will deliver to Lender evidence acceptable to Lender that each Insurance policy has been renewed. If the evidence of a renewal does not include a legible copy of the renewal policy, then Borrower will deliver a legible copy of such renewal policy no later than the earlier of (i) 60 days after the expiration date of the original policy or (ii) the date of any Notice of an insured loss given to Lender under Section 6.10(i).

(h)   Compliance With Insurance Requirements.  Borrower will comply with all Insurance requirements and will not permit any condition to exist on the Mortgaged Property that would invalidate any part of any Insurance coverage required under this Loan Agreement.

(i)   Obligations Upon Casualty; Proof of Loss.

    (i)   If an insured loss occurs, then Borrower will give immediate written Notice to the Insurance carrier and to Lender.

    (ii)   Borrower authorizes and appoints Lender as attorney in fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of Property Insurance, to appear in and prosecute any action arising from such Property Insurance policies, to collect and receive the proceeds of Property Insurance, to hold the proceeds of Property Insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 6.10 will require Lender to incur any expense or take any action.

(j)   Lender's Options Following a Casualty.  Lender may, at Lender's option, (i) hold the insurance proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender ("**Restoration**") or (ii) apply the Insurance proceeds to the payment of the Indebtedness, whether or not then due.

(k)   Lender's Succession to Insurance Policies.  If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, then Lender will automatically succeed to all rights of Borrower in and to any Insurance policies and unearned Insurance premiums and in

and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

(l)     Payments After Application of Insurance Proceeds. Unless Lender otherwise agrees in writing, any application of any Insurance proceeds to the Indebtedness will not extend or postpone the due date, or change the amount, of any monthly payments referred to in the Note or Article IV of this Loan Agreement.

(m)    Assignment of Insurance Proceeds.   Borrower agrees to execute such further evidence of assignment of any Insurance proceeds as Lender may require.

(n)    Borrower Acknowledgment of Lender's Right to Change Insurance Requirements. Borrower acknowledges and agrees that Lender's Insurance requirements may change from time to time throughout the term of the Indebtedness to include coverage for the kind of risks customarily insured against and in such minimum coverage amounts and maximum deductibles as are generally required by institutional lenders for properties comparable to the Mortgaged Property. The following requirements apply with respect to all Insurance policies and renewals of Insurance policies required by this Loan Agreement:

(i)     All Insurance policies will be in the form and with the terms required by Lender.

(ii)    All Insurance policies will be in such amounts, with such maximum deductibles and for such periods required by Lender.

(iii)   All Insurance policies will be issued by Insurance companies satisfactory to Lender.

**6.11   Condemnation.**

(a)    Rights Generally.  Borrower will promptly notify Lender in writing of any action or proceeding or notice relating to any proposed or actual condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect ("**Condemnation**"). Borrower will appear in, and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and appoints Lender as attorney in fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation, after consultation with Borrower and consistent with commercially reasonable standards of a prudent lender.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 6.11(a) will require Lender to incur any expense or take any action.  Borrower transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)    Application of Award.  Lender may hold such awards or proceeds and apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts (including Attorneys' Fees and Costs) at Lender's option, to the Restoration or Repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness will not extend or postpone the due date, or change the amount, of any monthly payments referred to in the Note or Article IV of this Loan Agreement.  Borrower agrees to execute such further evidence of assignment of any Condemnation awards or proceeds as Lender may require.

(c)    Right to Apply Condemnation Proceeds in Connection with a Partial Release. For so long as the Loan or any portion of the Loan is included in a Securitization, then each of the following will apply:

(i)     If any portion of the Mortgaged Property is released from the Lien of the Loan in connection with a Condemnation and if the ratio of (A) the unpaid principal balance of the Loan to (B) the value of the Mortgaged Property (taking into account only the related land and buildings and not any personal property or going-concern value), as determined by Lender in its discretion based on a commercially reasonable valuation method permitted in connection with a Securitization, is greater than 125% immediately after such Condemnation and before any Restoration or repair of the Mortgaged Property (but taking into account any planned Restoration or repair of the Mortgaged Property as if such planned Restoration or repair were completed), then Lender will apply any net proceeds or awards from such Condemnation, in full, to the payment of the principal of the Indebtedness whether or not then due and payable, unless Lender has received an opinion of counsel that a different application of such net proceeds or awards will not cause such Securitization to fail to meet applicable federal income tax qualification requirements or subject such Securitization to any tax.

(ii)    If neither Borrower nor Lender has the right to receive any or all net proceeds or awards as a result of the provisions of any agreement affecting the Mortgaged Property (including any condominium document or reciprocal easement agreement) and, therefore cannot apply such net proceeds or awards to the payment of the principal of the Indebtedness as set forth above, then Borrower will prepay the Indebtedness in an amount which Lender, in its discretion, deems necessary to ensure that the Securitization will not fail to meet applicable federal income tax qualification requirements or be subject to any tax as a result of the Condemnation.

(d)    <u>Succession to Condemnation Proceeds</u>.  If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, then Lender will automatically succeed to all rights of Borrower in and to any Condemnation proceeds and awards prior to such sale or acquisition.

**6.12    Environmental Hazards.**

(a)    <u>Prohibited Activities and Conditions</u>.

(i)     Except for matters permitted under this Section 6.12, Borrower will not cause or permit Prohibited Activities or Conditions.

(ii)    Borrower will comply with all Hazardous Materials Laws applicable to the Mortgaged Property.

(iii)   Borrower will take each of the following actions:

(A)    Obtain and maintain all Environmental Permits required by Hazardous Materials Laws and comply with all conditions of such Environmental Permits.

(B)    Cooperate with any inquiry by any Governmental Authority.

(C)    Comply with any governmental or judicial order that arises from any alleged Prohibited Activity or Condition.

(b)    <u>Employees, Tenants and Contractors</u>.  Borrower will take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the Effective Date) to prevent its employees, agents and contractors and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.  Borrower will not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(c)    <u>O&M Programs</u>.  On or prior to the Effective Date, Borrower will establish each of the O&M Programs marked as required in Article I. Each such O&M Program and any additional or revised

O&M Programs established for the Mortgaged Property pursuant to this Section 6.12 must be acceptable to Lender. Borrower will comply in a timely manner with, and cause all employees, agents and contractors of Borrower and any other Persons present on the Mortgaged Property to comply with, each O&M Program. Borrower will pay all costs of performance of Borrower's obligations under any O&M Program. Borrower will pay Lender's out of pocket costs incurred in connection with the monitoring and review of each O&M Program upon demand by Lender. Any such out-of-pocket costs of Lender that Borrower fails to pay promptly will become an additional part of the Indebtedness as provided in Section 8.02.

(d)     <u>Notice to Lender</u>.  Borrower will promptly give Notice to Lender upon the occurrence of any of the following events:

   (i)     Borrower's discovery of any Prohibited Activity or Condition.

   (ii)    Borrower's receipt of or knowledge of any written complaint, order, notice of violation or other communication from any tenant, Property Manager, Governmental Authority or other Person with regard to present or future alleged Prohibited Activities or Conditions, or any other environmental, health or safety matters affecting the Mortgaged Property.

   (iii)   Borrower's breach of any of its obligations under this Section 6.12.

Any such Notice given by Borrower will not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement, the Note or any other Loan Document.

(e)     <u>Environmental Inspections, Tests and Audits</u>.  Borrower will pay promptly the costs of any environmental inspections, tests or audits, a purpose of which is to identify the extent or cause of or potential for a Prohibited Activity or Condition ("**Environmental Inspections**"), required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Article VII, or required by Lender following a determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including Attorneys' Fees and Costs and the costs of technical consultants whether incurred in connection with any judicial or administrative process or otherwise) that Borrower fails to pay promptly will become an additional part of the Indebtedness as provided in Section 8.02. As long as: (i) no Event of Default has occurred and is continuing, (ii) Borrower has actually paid for or reimbursed Lender for all costs of any such Environmental Inspections performed or required by Lender, and (iii) Lender is not prohibited by law, contract or otherwise from doing so, Lender will make available to Borrower, without representation of any kind, copies of Environmental Inspections prepared by third parties and delivered to Lender. Lender reserves the right, and Borrower expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by or for Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any Environmental Inspections made by or for Lender. Borrower acknowledges that Lender cannot control or otherwise ensure the truthfulness or accuracy of the results of any Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount that a party may bid at such sale. Borrower agrees that Lender will have no liability whatsoever as a result of delivering the results of any Environmental Inspections made by or for Lender to any third party, and Borrower releases and forever discharges Lender from any and all claims, damages or causes of action arising out of, connected with or incidental to the results of the delivery of any Environmental Inspections made by or for Lender.

(f)     <u>Remedial Work</u>.  If any investigation, site monitoring, containment, clean-up, Restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property, or is otherwise required by Lender as a consequence of any Prohibited Activity or Condition or to prevent the occurrence of a Prohibited Activity or Condition, then Borrower will, by the earlier of (i) the applicable deadline required by Hazardous Materials Law, or (ii) 30 days after Notice from Lender demanding such

action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and must in any event complete the work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, then Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower will reimburse Lender on demand for the cost of doing so. Any reimbursement due from Borrower to Lender will become part of the Indebtedness as provided in Section 8.02.

6.13    **Borrower Entity Requirements and Limitations**

(a)    This Section 6.13 is not applicable to Borrowers who are natural persons.

(b)    Except as set forth in Section 6.13(a), until the Indebtedness is paid in full, Borrower will satisfy each of the following requirements:

   (i)    It will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its formation or organization and will do all things necessary to observe organizational formalities.

   (ii)    It will not merge or consolidate with any other Person.

   (iii)    It will not take any action to dissolve, wind-up, terminate or liquidate in whole or in part; to sell, transfer or otherwise dispose of all or substantially all of its assets; to change its legal structure; to transfer or permit the direct or indirect transfer of any partnership, membership or other equity interests, as applicable, other than Transfers permitted under this Loan Agreement; to issue additional partnership, membership or other equity interests, as applicable, or to seek to accomplish any of the foregoing.

   (iv)    It will not maintain its assets in a way difficult to segregate and identify.

(c)    If Borrower is identified as a Single Asset Entity in Article I, then Borrower will satisfy each of the following requirements:

   (i)    It will not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Mortgaged Property and such Personalty as may be necessary for the operation of the Mortgaged Property and will conduct and operate its business as presently conducted and operated.

   (ii)    It will not engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property and activities incidental to such ownership, operation, and maintenance.

(d)    If Borrower is identified as a Restricted Multiple Asset Entity in Article I, then Borrower will satisfy each of the following requirements:

   (i)    It will not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Mortgaged Property, the Permitted Property, and such Personalty as may be necessary for the operation of the Mortgaged Property and the Permitted Property and will conduct and operate its business as presently conducted and operated.

   (ii)    It will not engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property and the Permitted Property and activities incidental to such ownership, operation, and maintenance.

6.14    **Repairs and Capital Replacements.**

(a)    <u>Borrower Obligated to Complete Priority Repairs (including PR-90 Repairs)</u>.  Borrower will commence all Priority Repairs (including PR-90 Repairs) identified in the Physical Risk Report as soon as practicable after the Effective Date and will diligently proceed with and complete such Repairs.

(b)     Completion of Repairs and Capital Replacements in Good and Workmanlike Manner. All Repairs and Capital Replacements will be completed in a good and workmanlike manner, with suitable materials, and in accordance with good building practices and all applicable laws, ordinances, rules, regulations, building setback lines and restrictions applicable to the Mortgaged Property. Borrower agrees to cause the replacement of any material or work that is defective, unworkmanlike or that does not comply with the requirements of this Loan Agreement, as determined by Lender.

(c)     No Conditional Sales Contracts or Lease Agreements.  Without the prior written consent of Lender, no materials, machinery, equipment, fixtures or any other part of the Repairs or Capital Replacements will be purchased or installed under conditional sale contracts or lease agreements, or any other arrangement wherein title to such Repairs or Capital Replacements is retained or subjected to a purchase money security interest, or the right is reserved or accrues to anyone to remove or repossess any such Repairs or Capital Replacements, or to consider them as personal property.

(d)     Lien Protection.  Borrower will promptly pay or cause to be paid, when due, all costs, charges and expenses incurred in connection with the construction and completion of the Repairs or Capital Replacements, and will keep the Mortgaged Property free and clear of any and all Liens other than the Lien of the Security Instrument and any other junior Lien to which Lender has consented.

(e)     Adverse Claims.  Borrower will promptly advise Lender in writing of any litigation, Liens or claims affecting the Mortgaged Property and of all complaints and charges made by any Governmental Authority that may delay or adversely affect the Repairs or Capital Replacements.

(f)     Right to Complete Capital Replacements and Priority Repairs (including PR-90 Repairs). If Borrower abandons or fails to proceed diligently with any Capital Replacement or Priority Repair (including PR-90 Repairs), and such abandonment or failure continues for 30 days after Notice from Lender, then Lender will have the right (but not the obligation) to enter upon the Mortgaged Property and take over and cause the completion of such Capital Replacement or Priority Repair. However, no such Notice or cure period will apply in the case of such failure which could, in Lender's discretion, result in harm to Lender, tenants or third parties or impairment of the security given under this Loan Agreement, the Security Instrument or any other Loan Document.  Any contracts entered into or indebtedness incurred upon the exercise of such right may be in the name of Borrower, and Lender is irrevocably appointed the attorney in fact for Borrower, such appointment being coupled with an interest, to enter into such contracts, incur such obligations, enforce any contracts or agreements made by or on behalf of Borrower (including the prosecution and defense of all actions and proceedings in connection with the Capital Replacement or Priority Repair and the payment, settlement or compromise of all bills and claims for materials and work performed in connection with the Capital Replacement or Priority Repair) and do any and all things necessary or proper to complete any Capital Replacement or Priority Repair, including signing Borrower's name to any contracts and documents as may be deemed necessary by Lender.  In no event will Lender be required to expend its own funds to complete any Capital Replacement or Priority Repair, but Lender may advance such funds.  Any funds advanced will be added to the Indebtedness, secured by the Security Instrument and payable to Lender by Borrower in accordance with the provisions of the Note, this Loan Agreement, the Security Instrument and any other Loan Document pertaining to the protection of Lender's security and advances made by Lender.  Borrower waives any and all claims it may have against Lender for materials used, work performed or resultant damage to the Mortgaged Property.

(g)     Completion of Repairs and Capital Replacements Not a Certification by Lender.  Lender's disbursement of monies from the Capital Replacement and Repair Reserve Fund or other acknowledgment of completion of any Capital Replacement or Repair in a manner satisfactory to Lender will not be deemed a certification by Lender that the Capital Replacement or Repair has been completed in accordance with applicable building, zoning or other codes, ordinances, statutes, laws, regulations or requirements of any Governmental Authority.  Borrower will at all times have the sole responsibility for ensuring that all Capital Replacements and Repairs are completed in accordance with all such requirements of any Governmental Authority.

**6.15    Residential Leases Affecting the Mortgaged Property.**

   (a)    Borrower will, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units will be on forms acceptable to Lender, will be for initial terms of at least 6 months and not more than 2 years, and will not include options to purchase; provided, however, that up to 20% of all Leases may be for an initial term of less than 6 months, but not less than 1 month.

   (b)    If Borrower is a cooperative housing corporation or association, then so long as Borrower remains a cooperative housing corporation or association and is not in breach of any covenant of this Loan Agreement, Lender consents to each of the following:

      (i)    The execution of Leases for terms in excess of 2 years to a tenant shareholder of Borrower, so long as such Leases, including proprietary Leases, are and will remain subordinate to the Lien of the Security Instrument.

      (ii)    The surrender or termination of such Leases where the surrendered or terminated Lease is immediately replaced or where Borrower makes its best efforts to secure such immediate replacement by a newly-executed Lease of the same apartment to a tenant shareholder of Borrower.  However, no consent is given by Lender to any execution, surrender, termination or assignment of a Lease under terms that would waive or reduce the obligation of the resulting tenant shareholder under such Lease to pay cooperative assessments in full when due or the obligation of the former tenant shareholder to pay any unpaid portion of such assessments.

**6.16    Litigation; Government Proceedings.**  Borrower will give prompt Notice to Lender of any litigation or governmental proceedings pending or, to the best of Borrower's knowledge after due inquiry and investigation, threatened in writing against Borrower or any Borrower Principal which might have a Material Adverse Effect.

**6.17    Estoppel Certificates; Further Assurances; Lender's Expenses.**  Within 10 days after a request from Lender, Borrower will take each of the following actions:

   (a)    Deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any Person designated by Lender, as of the date of such statement:

      (i)    that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications),

      (ii)    the unpaid principal balance of the Note,

      (iii)    the date to which interest under the Note has been paid,

      (iv)    that Borrower is not in default under any of the Loan Documents (or, if Borrower is in default, describing such default in reasonable detail),

      (v)    whether there are any then-existing setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents, and

      (vi)    any additional facts requested by Lender.

   (b)    Execute, acknowledge and deliver and, if applicable, cause Guarantor to execute, acknowledge and deliver, at Borrower's expense (i) all amendments, modifications, corrections, deletions or additions to this Loan Agreement, the Note, the Security Instrument and/or any other Loan Document, and (ii) any further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances, as may be required by Lender from time to time in order to correct clerical errors and legal deficiencies and to better assure, grant and convey to

Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents, or in connection with Lender's consent rights under Article VII; provided, however, that this Section 6.17 is not intended to require Borrower to execute any corrective amendment or modification of the Loan Documents that has the effect of (x) changing the essential economic terms of the Loan set forth in the Commitment Letter, or (y) imposing greater liability under the Loan Documents than that set forth in the terms of the Commitment Letter.

(c)     Borrower agrees that, in connection with each request by Borrower under this Loan Agreement or any Loan Document, Borrower will pay or reimburse Lender for all reasonable Attorneys' Fees and Costs and expenses incurred by Lender and Loan Servicer, including any fees charged by the Rating Agencies, if applicable, regardless of whether the matter is approved, denied or withdrawn.   Any reimbursement due from Borrower to Lender will become part of the Indebtedness as provided in Section 8.02.

**6.18    ERISA Requirements.**

(a)     This Section 6.18 is not applicable to Borrowers who are natural persons.

(b)     Borrower will not engage in any transaction which would cause an action by either Borrower or Lender permitted or required under this Loan Agreement or any other Loan Document to be a non-exempt prohibited transaction under either ERISA or Section 4975 of the Tax Code.

(c)     When requested by Lender, Borrower will deliver to Lender a certification from Borrower with supporting evidence satisfactory to Lender that each of the following is true:

    (i)     Borrower is not any of the following:

        (A)     An "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA.

        (B)     A "plan" to which Section 4975 of the Tax Code applies.

        (C)     An entity whose underlying assets constitute "plan assets" of one or more of the plans described in Sections 6.18(c)(i)(A) and (B).

        (D)     A "governmental plan" within the meaning of Section 3(32) of ERISA.

    (ii)     Borrower is not subject to state statutes regulating investments or fiduciary obligations with respect to governmental plans.

    (iii)     At least one of the following circumstances is true:

        (A)     None of the equity interests in Borrower are held by "benefit plan investors" within the meaning of Section 3(42) of ERISA.

        (B)     Less than 25% of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of Section 3(42) of ERISA.

        (C)     Equity interests in Borrower are publicly offered securities within the meaning of 29 C.F.R. Section 2510.3-101(b)(2), as amended or any successor provision.

        (D)     Borrower qualifies as either an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. Section 2510.3-101(c) or (e), as either may be amended or any successor provisions.

        (E)     Borrower is an investment company registered under the Investment Company Act of 1940.

**6.19    Regulatory Agreement.** If the Mortgaged Property is subject to a Regulatory Agreement, then Borrower will do each of the following:

(a)    Promptly provide Lender with a copy of (i) any compliance report submitted to the Regulatory Agreement Agency concurrently with such submission, and (ii) any notice Borrower receives alleging that Borrower is in breach of the Regulatory Agreement.

(b)    Obtain Lender's prior approval of any amendment to or modification of the Regulatory Agreement.

(c)    Provide Lender with Notice upon termination of the Regulatory Agreement.

**6.20    Economic Sanctions Laws.**

(a)    Borrower will comply with, and cause each Borrower Principal and Non-U.S. Equity Holder to comply with, the Economic Sanctions Laws.

(b)    Borrower will establish and maintain practices and procedures that ensure no Person who is listed on any Prohibited Parties List is admitted into the ownership or management of Borrower. Borrower will cause each Borrower Principal to establish and maintain equivalent practices and procedures.

**ARTICLE VII      TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

**7.01    Permitted Transfers.** The occurrence of any of the following Transfers will not constitute an Event of Default under this Loan Agreement, notwithstanding any provision of Section 7.02 to the contrary:

(a)    A Transfer to which Lender has consented.

(b)    A Transfer that is not a prohibited Transfer pursuant to Section 7.02.

(c)    A Transfer that is conditionally permitted pursuant to Section 7.03 upon the satisfaction of all applicable conditions

(d)    A Preapproved Intrafamily Transfer that satisfies the requirements of Section 7.04.

(e)    The grant of a leasehold interest in an individual dwelling unit for a term of 2 years or less (or longer if approved by Lender in writing) not containing an option to purchase.

(f)    Entering into any new Non-Residential Lease, or modifying or terminating any existing Non-Residential Lease, in each case to which Lender has provided its prior written consent.

(g)    A Condemnation with respect to which Borrower satisfies the requirements of Section 6.11.

(h)    A Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of Liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender.

(i)    The creation of a mechanic's, materialmen's or judgment Lien against the Mortgaged Property which is released of record, bonded or otherwise remedied to Lender's satisfaction within 60 days after the date of creation; provided, however, if Borrower is diligently prosecuting such release or other remedy and advises Lender that such release or remedy cannot be consummated within such 60-day period, Borrower will have an additional period of time (not exceeding 120 days from the date of creation or such earlier time as may be required by applicable law in which the lienholder must act to enforce the Lien) within which to obtain such release of record or consummate such other remedy.

(j)     If Borrower is a housing cooperative corporation or association, the Transfer of the shares in the housing cooperative or the assignment of the occupancy agreements or Leases relating to the occupancy agreements to tenant shareholders of the housing cooperative or association.

**7.02**    **Prohibited Transfers.**  The occurrence of any of the following Transfers will constitute an Event of Default under this Loan Agreement:

(a)     A Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property, including the grant, creation or existence of any Lien on the Mortgaged Property, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the Lien of the Security Instrument, other than the Lien of the Security Instrument, or any other Lien to which Lender has consented.

(b)     A Transfer or series of Transfers of any legal or equitable interest of any Guarantor which owns a direct or indirect interest in Borrower that result(s) in such Guarantor no longer owning any direct or indirect interest in Borrower.

(c)     A Transfer or series of Transfers of any legal or equitable interest since the Effective Date that result(s) in a change of more than 50% of the ownership interests (or beneficial interests, if the applicable entity is a trust) in Borrower or any Person that Controls Borrower.

(d)     A Transfer of any general partnership interest in a partnership, or any manager interest (whether a member manager or nonmember manager) in a limited liability company if such partnership or limited liability company, as applicable, is Borrower or a Person that Controls Borrower.

(e)     If Borrower or any Person that Controls Borrower is a corporation whose outstanding voting stock is held by 100 or more shareholders, one or more Transfers by a single transferor within a 12-month period affecting an aggregate of 10% or more of that stock.

(f)     The grant, creation or existence of any Lien, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the Lien of the Security Instrument, on any ownership interest in Borrower or any Person that Controls Borrower, if the foreclosure of such Lien would result in a Transfer prohibited under Sections 7.02(b), (c), (d), or (e).

(g)     A change in the trustee of a trust that is a Borrower or a Person that Controls Borrower unless (i) the change is permitted in Section 7.04 or (ii) the trust is a real estate investment trust.

(h)     If Borrower or any Person that Controls Borrower is a trust, the termination or revocation of the trust.

**7.03**    **Conditionally Permitted Transfers.**  The occurrence of any of the following Transfers will not constitute a prohibited Transfer under Section 7.02, provided that Borrower or New Borrower, as applicable, has complied with all applicable specified conditions in this Section 7.03.

(a)     **Transfer by Devise, Descent or Operation of Law (Entity Borrowers Only).**  Upon the death of a natural person, a Transfer which occurs by devise, descent, or by operation of law (but excluding a Transfer as a result of the death of a Borrower that is a natural person) to one or more Immediate Family Members of such natural person or to a trust or family conservatorship established for the benefit of such Immediate Family Members (each a "**Beneficiary**"), provided that each of the following conditions is satisfied:

(i)     The Property Manager (if applicable) continues to be responsible for the management of the Mortgaged Property, and such Transfer will not result in a change in the day-to-day operations of the Mortgaged Property.

(ii)     Lender receives confirmation acceptable to Lender that Borrower continues to satisfy the requirements of Section 6.13.

(iii)      Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

(iv)      Each Guarantor executes such documents and agreements as Lender requires to ratify each Guaranty, or in the event of the death of any Guarantor, Borrower causes one of the following to occur:

         (A)      Within 60 days following the Guarantor's death, one or more Persons acceptable to Lender execute(s) and deliver(s) to Lender a replacement guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

         (B)      The estate of the deceased Guarantor immediately ratifies the Guaranty in writing, and within 6 months after the date of the death of the deceased Guarantor, one or more Persons acceptable to Lender execute(s) and deliver(s) to Lender a guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

(v)      Borrower gives Lender Notice of such Transfer together with copies of all documents effecting such Transfer not more than 30 days after the date of such Transfer, and contemporaneously with the Notice, takes each of the following additional actions:

         (A)      Borrower reaffirms the representations and warranties under Article V.

         (B)      Borrower satisfies Lender that the Beneficiary's organization, credit and experience in the management of similar properties are appropriate to the overall structure and documentation of the existing financing.

(vi)      Borrower (A) pays the Transfer Processing Fee to Lender, and (B) pays or reimburses Lender, upon demand, for all costs and expenses, including all Attorneys' Fees and Costs, incurred by Lender in connection with such Transfer; provided, however, that Lender will not be entitled to collect a Transfer Fee.

(b)      **Transfer by Devise, Descent or Operation of Law (Individual Borrowers Only).** A Transfer which occurs by devise, descent, or by operation of law upon the death of a Borrower who is a natural person to an entity or individual (either, a "**New Borrower**"), provided that each of the following conditions is satisfied:

(i)      New Borrower gives Lender Notice of such Transfer within 60 days after the death.

(ii)      The Property Manager (if applicable) continues to be responsible for the management of the Mortgaged Property, and such Transfer will not result in a change in the day-to-day operations of the Mortgaged Property.

(iii)      Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

(iv)      Lender receives confirmation acceptable to Lender that New Borrower satisfies the requirements of Section 6.13.

(v)      Each Guarantor executes such documents and agreements as Lender requires to ratify each Guaranty.

(vi)      All of Lender's requirements are satisfied, as determined by Lender in Lender's discretion within a period of time as determined by Lender in Lender's discretion.

(vii)      New Borrower (A) pays the Transfer Processing Fee to Lender, and (B) pays or reimburses Lender, upon demand, for all costs and expenses including all Attorneys'

Fees and Costs, incurred by Lender in connection with such Transfer; provided, however, that Lender will not be entitled to collect a Transfer Fee.

**7.04**    **Preapproved Intrafamily Transfers (Entity Borrowers).** The occurrence of a Transfer of more than a 50% interest in Borrower or a Person that Controls Borrower as set forth in this Section 7.04 will be considered a "**Preapproved Intrafamily Transfer**" provided that each of the conditions set forth in Sections 7.04(a) and (b) is satisfied:

   (a)    <u>Type of Transfer</u>. The Transfer is one of the following:

      (i)    A sale or transfer to one or more of the transferor's Immediate Family Members.

      (ii)    A sale or transfer to any trust having as its sole beneficiaries the transferor and/or one or more of the transferor's Immediate Family Members.

      (iii)    A sale or transfer from a trust to any one or more of its beneficiaries who are the settlor and/or Immediate Family Members of the settlor of the trust.

      (iv)    The substitution or replacement of the trustee of any trust with a trustee who is an Immediate Family Member of the settlor of the trust.

      (v)    A sale or transfer from a natural person to an entity owned and under the Control of the transferor or the transferor's Immediate Family Members.

   (b)    <u>Conditions</u>. The Preapproved Intrafamily Transfer satisfies each of the following conditions:

      (i)    Borrower provides Lender with 30 days prior Notice of the proposed Preapproved Intrafamily Transfer and pays the Transfer Processing Fee.

      (ii)    Following the Transfer, Control and management of the day-to-day operations of Borrower continue to be held by the Person exercising such Control and management immediately prior to the Transfer and there is no change in Guarantor, if applicable.

      (iii)    Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

      (iv)    At the time of the Preapproved Intrafamily Transfer, no Event of Default has occurred and is continuing and no event or condition has occurred and is continuing that, with the giving of Notice or the passage of time, or both, would become an Event of Default.

      (v)    Borrower pays Lender all of Lender's costs, including the cost of all title searches, title insurance and recording costs, and all Attorneys' Fees and Costs; provided, however, that Lender will not be entitled to collect a Transfer Fee.

      (vi)    Lender receives confirmation acceptable to Lender that Section 6.13 continues to be satisfied.

**7.05**    **Lender's Consent to Prohibited Transfers.** With respect to a Transfer that would otherwise constitute an Event of Default under this Article VII, Lender will consent, without any adjustment to the rate at which the Indebtedness bears interest or to any other economic terms of the Indebtedness set forth in the Note, provided that, prior to such Transfer, all of Lender's requirements are satisfied, as determined by Lender, including payment by Borrower of (i) a Transfer Processing Fee, (ii) all of Lender's costs, including the cost of all title searches, title insurance and recording costs, and all Attorneys' Fees and Costs incurred in reviewing the Transfer request and any fees charged by the Rating Agencies, if applicable and (iii) in the case of a Transfer of all or any part of the Mortgaged Property other than a grant of an easement, a Transfer Fee.

**ARTICLE VIII   EVENTS OF DEFAULT AND REMEDIES.**

8.01    **Events of Default.** The occurrence of any one or more of the following will constitute an "**Event of Default**" under this Loan Agreement:

 (a) Borrower fails to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document.

 (b) Borrower or any of its officers, directors, trustees, general partners, or managers, or any Guarantor, commits fraud or makes a material misrepresentation or material omission in connection with any of the following:

  (i) The application for or creation of the Indebtedness.

  (ii) Any financial statement, Rent Schedule or other report or information provided to Lender during the term of the Indebtedness.

  (iii) Any request for Lender's consent to any proposed action, including a request for disbursement of funds under this Loan Agreement.

 (c) Borrower has made any representation or warranty in this Loan Agreement that is false or misleading in any material respect.

 (d) Borrower fails to maintain the Insurance coverage required by Section 6.10.

 (e) Borrower fails to comply with the Condemnation provisions of Section 6.11.

 (f) Borrower fails to comply with the provisions of Section 6.13.

 (g) A Transfer occurs that violates the provisions of Article VII, whether or not any actual impairment of Lender's security results from such Transfer.

 (h) A forfeiture action or proceeding, whether civil or criminal, is commenced which could result in a forfeiture of the Mortgaged Property or otherwise materially impair the Lien created by the Security Instrument or Lender's interest in the Mortgaged Property.

 (i) The holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property exercises any right to declare all amounts due under that debt instrument immediately due and payable.

 (j) Borrower fails to perform any of its obligations under any of the following, and such failure continues beyond any applicable cure period:

  (i) Any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property and any other loan documents identified in that debt instrument.

  (ii) Any covenants, conditions and/or restrictions, land use restriction agreements, or similar agreements recorded against the Mortgaged Property.

  (iii) Any ground lease encumbering all or any portion of the Mortgaged Property.

 (k) Any default, event of default or breach (however such terms may be defined in the Regulatory Agreement, if applicable) under any applicable Regulatory Agreement which continues beyond the applicable cure period, if any.

 (l) Any of the following occurs:

  (i) Borrower commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency,

reorganization, conservatorship or relief of debtors (A) seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debt, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets.

(ii)     Any party other than Lender commences any case, proceeding or other action of a nature referred to in Section 8.01(l)(i) against Borrower which (A) results in the entry of an order for relief or any such adjudication or appointment, or (B) has not been dismissed, discharged or bonded within a period of 90 days following commencement.

(iii)    Any case, proceeding or other action is commenced against Borrower seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order by a court of competent jurisdiction for any such relief which is not vacated, discharged, or stayed or bonded pending appeal within 90 days from the entry of such order.

(iv)    Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 8.01(l)(i), (ii) or (iii).

(m)    If Borrower is a general partnership, any of the following occurs:

(i)     Any general partner of Borrower commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors (A) seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debt, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets.

(ii)     Any party other than Lender commences any case, proceeding, or other action of a nature referred to in Section 8.01(m)(i) against any general partner of Borrower which (A) results in the entry of an order for relief or any such adjudication or appointment, or (B) has not been dismissed, discharged, stayed, or bonded within a period of 90 days following commencement.

(iii)    Any case, proceeding or other action is commenced against any general partner of Borrower seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order by a court of competent jurisdiction for any such relief which is not vacated, discharged, stayed or bonded pending appeal within 90 days from the entry of such order.

(iv)    Any general partner of Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 8.01(m)(i), (ii) or (iii).

(n)    A Guarantor files for bankruptcy protection under the Bankruptcy Code or a Guarantor voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or any creditor (other than Lender) of a Guarantor commences any involuntary case against a Guarantor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights, unless each of the following conditions is satisfied:

(i)     Borrower or Guarantor provides Notice of such action to Lender within 30 days after the filing of such action.

(ii)    Either (A) the case is dismissed or discharged within 90 days after filing, or (B) within 90 days following the date of such filing or commencement, the affected Guarantor is replaced with one or more other Persons acceptable to Lender, each of whom executes and delivers to Lender a replacement Guaranty in form and content acceptable to Lender; provided, however, that if Lender determines that any proposed replacement Guarantor is not acceptable, then the action will constitute a prohibited Transfer governed by Section 7.02.

(iii)    If Borrower must provide a replacement Guarantor pursuant to Section 8.01(n)(ii), Borrower pays the Transfer Processing Fee to Lender.

(o)    The dissolution of any Guarantor that is an entity, unless within 30 days following the dissolution of Guarantor, Borrower causes one or more Persons acceptable to Lender to execute and deliver to Lender a guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

(p)    The death of any Guarantor who is a natural person, unless Borrower satisfies one of the conditions set forth in Section 7.03(a)(iii).

(q)    If the Guaranty includes the "Expiring Term of Existence" rider, the Expiring Guarantor (as defined in the rider) does not comply with any of the requirements in the rider, including extending its term of existence, providing one or more replacement guarantors, or providing cash or letter of credit collateral for its obligations under the Guaranty.

(r)    Borrower fails to perform any of its obligations under this Loan Agreement (other than those Events of Default specified in Sections 8.01(a) through (q) or included on any exhibit, schedule, or rider attached to this Loan Agreement) as and when required, and that failure continues for a period of 30 days after Notice of the failure by Lender to Borrower.

However, if Borrower's failure to perform its obligations as described in this Section 8.01(r) is of the nature that it cannot be cured within the 30-day cure period after Notice from Lender but reasonably could be cured within 90 days, then Borrower will have additional time as determined by Lender (not to exceed an additional 60 days) in which to cure the default, provided that Borrower has diligently commenced to cure the default during the initial 30-day cure period and diligently pursues the cure of the default.

No Notice or cure periods will apply in the case of any failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Loan Agreement, result in harm to Lender, danger to tenants or third parties, or impairment of the Note, the Security Instrument, this Loan Agreement, or any other security given under any other Loan Document.

(s)    Borrower fails to perform any of its obligations as and when required under any Loan Document other than this Loan Agreement and that failure continues beyond the applicable cure period, if any, specified in that Loan Document.

**8.02    Protection of Lender's Security; Security Instrument Secures Future Advances.**

(a)    If Borrower fails to perform any of its obligations under this Loan Agreement or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender may make such appearances, file such documents, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including: (i) payment of Attorneys' Fees and Costs, (ii) payment of fees and out-of-pocket expenses of accountants, inspectors and consultants, (iii) entry upon the Mortgaged Property to make Repairs or secure the Mortgaged Property, (iv) procurement of the Insurance required by Section 6.10, (v) payment of amounts which Borrower has failed to pay under Section 6.08, (vi) performance of Borrower's obligations under Section

6.09, and (vii) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a Prior Lien.

(b) Any amounts disbursed by Lender under this Section 8.02, or under any other provision of this Loan Agreement that treats such disbursement as being made under this Section 8.02, will be secured by the Security Instrument, will be added to, and become part of, the principal component of the Indebtedness, will be immediately due and payable and will bear interest from the date of disbursement until paid at the Default Rate.

(c) Nothing in this Section 8.02 will require Lender to incur any expense or take any action.

## 8.03 Remedies.

(a) Upon an Event of Default, Lender may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower will pay all associated costs, including Attorneys' Fees and Costs.

(b) Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender.  Lender may exercise any such remedies from time to time and as often as Lender chooses.

(c) Lender will have all remedies available to Lender under Revised Article 9 of the UCC of the Property Jurisdiction, the Loan Documents and under applicable law.

(d) Lender may also retain all money in the Reserve Funds, including interest, and in Lender's discretion, may apply such amounts, without restriction and without any specific order of priority, to the payment of any and all Indebtedness.

(e) If a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where, by law or under this Loan Agreement or the other Loan Documents, Lender has an obligation to act reasonably or promptly, then Lender will not be liable for any monetary damages, and Borrower's sole remedy will be limited to commencing an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably will be determined by an action seeking declaratory judgment.

## 8.04 Forbearance.

(a) Lender may (but will not be obligated to) agree with Borrower, from time to time, and without giving Notice to, or obtaining the consent of, or having any effect upon the obligations of, any Guarantor or other third party obligor, to take any of the following actions:

(i) Extend the time for payment of all or any part of the Indebtedness.

(ii) Reduce the payments due under any of the Loan Documents.

(iii) Release anyone liable for the payment of any amounts due under any of the Loan Documents.

(iv) Accept a renewal of the Note.

(v) Modify the terms and time of payment of the Indebtedness.

(vi) Join in any extension or subordination agreement.

(vii) Release any portion of the Mortgaged Property.

(viii)   Take or release other or additional security.

(ix)   Modify the rate of interest or period of amortization of the Note or change the amount of the monthly payments payable under the Note.

(x)   Otherwise modify this Loan Agreement, the Note or any other Loan Document.

(b)   Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law will not be a waiver of or preclude the exercise of any other right or remedy, or the subsequent exercise of any right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, will not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness will not constitute an election of remedies by Lender so as to preclude the exercise of any other right available to Lender.  Lender's receipt of any awards or proceeds under Sections 6.10 and 6.11 will not operate to cure or waive any Event of Default.

**8.05    Waiver of Marshalling.**  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender will have the right to determine the order in which any or all of the Mortgaged Property will be subjected to the remedies provided in this Loan Agreement or any other Loan Document or applicable law. Lender will have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.  Borrower and any party who now or in the future owns or acquires a security interest in the Mortgaged Property and who has actual or constructive notice of the Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement.

## ARTICLE IX    RELEASE; INDEMNITY.

**9.01    Release.**  Borrower covenants and agrees that, in performing any of its duties under this Loan Agreement, none of Lender, Loan Servicer or any of their respective agents or employees will be liable for any losses, claims, damages, liabilities, or expenses that may be incurred by any of them as a result of such performance, except that no party will be released from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

**9.02    Indemnity.**

(a)   <u>General Indemnity.</u>  Borrower agrees to indemnify, hold harmless and defend Lender, including any custodian, trustee and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties, any prior owner or holder of the Note, the Loan Servicer, any prior Loan Servicer, the officers, directors, shareholders, partners, employees and trustees of each of the foregoing, and the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, "**Indemnitees**") against any and all losses, claims, damages, liabilities, and expenses, including Attorneys' Fees and Costs, which may be imposed or incurred by any of them directly or indirectly arising out of, or in any way relating to, or as a result of:  (i) any failure of the Mortgaged Property to comply with the laws, regulations, ordinances, codes or decrees of any Governmental Authority, including those pertaining to the Americans with Disabilities Act, zoning, occupancy and subdivision of real property, (ii) any obligation of Borrower under any Lease, and (iii) any accident, injury or death to any natural person on the Mortgaged Property or any damage to personal property located on the Mortgaged Property, except that no such party will be indemnified from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

(b)   <u>Environmental Indemnity.</u>  Borrower agrees to indemnify, hold harmless and defend Indemnitees from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including Attorneys' Fees and Costs and

remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(i)     Any breach of any representation or warranty of Borrower in Section 5.05.

(ii)    Any failure by Borrower to perform any of its obligations under Section 6.12.

(iii)   The existence or alleged existence of any Prohibited Activity or Condition.

(iv)    The presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or in any of the Improvements.

(v)     The actual or alleged violation of any Hazardous Materials Law.

(c)     Indemnification Regarding ERISA Covenants.  **BORROWER WILL INDEMNIFY LENDER AND DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CIVIL PENALTIES, EXCISE TAXES, OR OTHER LOSS, COST, DAMAGE AND EXPENSE (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS INCURRED IN THE INVESTIGATION, DEFENSE AND SETTLEMENT OF CLAIMS AND LOSSES INCURRED IN CORRECTING ANY PROHIBITED TRANSACTION OR IN THE SALE OF A PROHIBITED LOAN, AND IN OBTAINING ANY INDIVIDUAL PROHIBITED TRANSACTION EXEMPTION UNDER ERISA THAT MAY BE REQUIRED, IN LENDER'S DISCRETION) THAT LENDER MAY INCUR, DIRECTLY OR INDIRECTLY, AS A RESULT OF DEFAULT UNDER SECTION 6.18. THIS INDEMNITY WILL SURVIVE ANY TERMINATION, SATISFACTION OR FORECLOSURE OF THE SECURITY INSTRUMENT.**

(d)     Selection and Direction of Counsel.  Counsel selected by Borrower to defend Indemnitees will be subject to the approval of those Indemnitees. In any circumstances in which the indemnity under this Article IX applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which will not be unreasonably withheld, delayed or conditioned) may settle or compromise any action or legal or administrative proceeding. However, unless an Event of Default has occurred and is continuing, or the interests of Borrower and Lender are in conflict, as determined by Lender, Lender will permit Borrower to undertake the actions referenced in this Article IX so long as Lender approves such action, which approval will not be unreasonably withheld or delayed. Borrower will reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, consultants' fees and Attorneys' Fees and Costs.

(e)     Settlement or Compromise of Claims.  Borrower will not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding ("**Claim**"), settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender, or (ii) may materially and adversely affect Lender, as determined by Lender.

(f)     Effect of Changes to Loan on Indemnification Obligations.  Borrower's obligation to indemnify the Indemnitees will not be limited or impaired by any of the following, or by any failure of Borrower or any Guarantor to receive notice of or consideration for any of the following:

(i)     Any amendment or modification of any Loan Document.

(ii)    Any extensions of time for performance required by any Loan Document.

(iii)   Any provision in any of the Loan Documents limiting Lender's recourse to property securing the Indebtedness, or limiting the personal liability of Borrower or any other party for payment of all or any part of the Indebtedness.

(iv)     The accuracy or inaccuracy of any representations and warranties made by Borrower under any of the Loan Documents.

(v)      The release of Borrower or any other Person, by Lender or by operation of law, from performance of any obligation under any Loan Document.

(vi)     The release or substitution in whole or in part of any security for the Indebtedness.

(vii)    Lender's failure to properly perfect any Lien or security interest given as security for the Indebtedness.

(g)  <u>Payments by Borrower</u>.  Borrower will, at its own cost and expense, do all of the following:

(i)      Pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding arising out of any matters against which Indemnitees are entitled to be indemnified under this Article IX.

(ii)     Reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Article IX.

(iii)    Reimburse Indemnitees for any and all expenses, including Attorneys' Fees and Costs, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Article IX, or in monitoring and participating in any legal or administrative proceeding.

(h)  <u>Other Obligations</u>.  The provisions of this Article IX will be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee will be entitled to indemnification under this Article IX without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any Guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one Person, then the obligation of those Persons to indemnify the Indemnitees under this Article IX will be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Article IX will survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the Lien of the Security Instrument. However, if Lender has never been a mortgagee-in-possession of, or held title to, the Mortgaged Property, Borrower will have no obligation to indemnify the Indemnitees under this Article IX after the date of the release of record of the Lien of the Security Instrument by payment in full at the Maturity Date or by voluntary prepayment in full.

## ARTICLE X    MISCELLANEOUS PROVISIONS.

**10.01    Waiver of Statute of Limitations, Offsets and Counterclaims.**  Borrower waives the right to assert any statute of limitations as a bar to the enforcement of this Loan Agreement or the Lien of the Security Instrument or to any action brought to enforce any Loan Document.  Borrower waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations under the Loan Documents will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**10.02    Governing Law; Consent to Jurisdiction and Venue.**

(a)      This Loan Agreement, and any Loan Document which does not itself expressly identify the law that applies to it, will be governed by the laws of the Property Jurisdiction.

(b)      Borrower agrees that any controversy arising under or in relation to the Note, the Security Instrument, this Loan Agreement or any other Loan Document may be litigated in the Property Jurisdiction.   The state and federal courts and authorities with jurisdiction in the Property

Jurisdiction will have jurisdiction over all controversies that may arise under or in relation to the Note, any security for the Indebtedness or any other Loan Document. Borrower irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Section 10.02 is intended to limit Lender's right to bring any suit, action or proceeding relating to matters under this Loan Agreement in any court of any other jurisdiction.

**10.03 Notice.**

(a)     All Notices under or concerning this Loan Agreement will be in writing.  Each Notice will be deemed given on the earliest to occur of: (i) the date when the Notice is received by the addressee, (ii) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery, or (iii) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. Addresses for Notice are as shown in Article I.

(b)     Any party to this Loan Agreement may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 10.03. Each party agrees that it will not refuse or reject delivery of any Notice given in accordance with this Section 10.03, that it will acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice that it rejects or refuses will be deemed for purposes of this Section 10.03 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)     Any Notice under any other Loan Document that does not specify how Notices are to be given will be given in accordance with this Section 10.03.

**10.04   Successors and Assigns Bound.**  This Loan Agreement will bind the respective successors and assigns of Borrower and Lender, and the rights granted by this Loan Agreement will inure to Lender's successors and assigns.

**10.05   Joint and Several (and Solidary) Liability.**  If more than one Person signs this Loan Agreement as Borrower, then the obligations of such Persons will be joint and several.  For a Mortgaged Property located in Louisiana, if more than one Person signs this Loan Agreement as Borrower, then the obligations of such Persons will be joint and several and solidary, and wherever the phrase "joint and several" appears in this Loan Agreement, the phrase is amended to read "joint, several, and solidary."

**10.06   Relationship of Parties; No Third Party Beneficiary.**

(a)     The relationship between Lender and Borrower will be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement will create any other relationship between Lender and Borrower.  Nothing contained in this Loan Agreement will constitute Lender as a joint venturer, partner or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations or contracts of Borrower.

(b)     No creditor of any party to this Loan Agreement and no other Person will be a third party beneficiary of this Loan Agreement or any other Loan Document. Any arrangement between Lender and any Loan Servicer for loss sharing or interim advancement of funds (**"Servicing Arrangement"**) will constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness. Borrower will not be a third party beneficiary of any Servicing Arrangement. No payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**10.07   Subrogation.**  If the proceeds of the Loan, or subsequent advances under Section 8.02, are used to pay, satisfy or discharge a Prior Lien, then such Loan proceeds or advances will be deemed to have been advanced by Lender at Borrower's request, and Lender will automatically, and without further action on its part, be subrogated to the rights, including Lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**10.08**   **Severability.** The invalidity or unenforceability of any provision of this Loan Agreement will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Loan Agreement contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Loan Agreement.

**10.09**   **Amendments.** This Loan Agreement may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**10.10**   **Disclosure of Information; Authorization to Publicly Use Loan Information.**

(a)   Borrower acknowledges that Lender may provide to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, ownership, purchase, participation or Securitization (if applicable) of the Loan, including any of the Rating Agencies, any entity maintaining databases on the underwriting and performance of commercial mortgage loans, as well as governmental regulatory agencies having regulatory authority over Lender, any and all information which Lender now has or may hereafter acquire relating to the Loan, the Mortgaged Property, Borrower or any Guarantor, as Lender determines necessary or desirable and that such information may be included in disclosure documents in connection with a Securitization (if applicable) or syndication of participation interests, including a prospectus, prospectus supplement, offering memorandum, private placement memorandum or similar document (each, a **"Disclosure Document"**) and also may be included in any filing with the Securities and Exchange Commission pursuant to the Securities Act or the Securities Exchange Act. To the fullest extent permitted under applicable law, Borrower irrevocably waives all rights, if any, to prohibit such disclosure, including any right of privacy.

(b)   Borrower agrees that Lender may publicly use, at Lender's discretion, the name of the Mortgaged Property, photographs of the Mortgaged Property, and basic transaction information (for example, the number of units in the Mortgaged Property and the Loan Amount) relating to the Loan.

**10.11**   **Determinations by Lender.** In any instance where the consent or approval of Lender may be given or is required, or where Lender is authorized to render any determination, judgment, or decision under this Loan Agreement, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision will be made or exercised by Lender (or its designated representative) at its option and in its discretion.

**10.12**   **Sale of Note; Change in Loan Servicer; Loan Servicing.** The Note or a partial interest in the Note (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior Notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, then Borrower will be given Notice of the change. The Loan Servicer may take all actions regarding the servicing of the Loan unless Borrower receives Notice to the contrary, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of Books and Records, and the granting of consents and approvals. If Borrower receives conflicting Notices regarding the identity of the Loan Servicer or any other subject, then any such Notice from Lender will govern.

**10.13**   **Subordinate Financing.** Freddie Mac will not purchase, but may permit another lender to extend to Borrower, subordinate financing secured by the Mortgaged Property, provided that all of Lender's requirements are satisfied.

**10.14**   **Lender's Rights to Sell or Securitize.** Borrower acknowledges that Lender, and each successor to Lender's interest, may (without prior Notice to Borrower or Borrower's prior consent), sell or grant participations in the Loan (or any part of the Loan), sell or subcontract the servicing rights related to the Loan, securitize the Loan or place the Loan in a trust. Borrower, at its expense, agrees to cooperate with all requests of Lender in connection with any of the foregoing including taking the following actions:

(a)   Executing any financing statements or other documents deemed necessary by Lender or its transferee to create, perfect or preserve the rights and interest to be acquired by such transferee.

(b) Delivering revised organizational documents, counsel opinions and executed amendments to the Loan Documents satisfactory to the Rating Agencies.

(c) Providing updated financial information with appropriate verification through auditors' letters, if required by Lender.

(d) Providing updated information on all litigation proceedings affecting Borrower or any Borrower Principal as required in Section 6.16.

(e) Reviewing information contained in any Disclosure Document and providing a mortgagor estoppel certificate, written confirmation of Borrower's indemnification obligations under this Loan Agreement, and such other information about Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, any Property Manager, or the Mortgaged Property as Lender may require for Lender's offering materials.

10.15 **Cooperation with Rating Agencies and Investors.** If Lender decides to include the Loan as an asset of a Secondary Market Transaction, then Borrower will do all of the following:

(a) At Lender's request, meet with representatives of the Rating Agencies and/or investors to discuss the business and operations of the Mortgaged Property.

(b) Permit Lender or its representatives to provide related information to the Rating Agencies and/or investors.

(c) Cooperate with the reasonable requests of the Rating Agencies and/or investors in connection with all of the foregoing.

10.16 **Exhibits, Schedules, and Riders.** This Loan Agreement incorporates all of the attached exhibits, schedules, and riders that are listed in Article I or elsewhere in this Loan Agreement.

10.17 **State Specific Provisions.**

<u>If the Property Jurisdiction is Indiana</u>:
For purposes of Section 3.04(b)(ii), Attorneys' Fees and Costs means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping, and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees.

<u>If the Property Jurisdiction is Kansas:</u>
Pursuant to K.S.A. Section 16-118, the parties agree that:
**ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FOREBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED, THAT IS IN ANY WAY RELATED TO THIS LOAN AGREEMENT. TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS REACHED BY THE PARTIES COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, EXCEPT AS THEY MAY LATER AGREE IN WRITING TO MODIFY IT.**

10.18 **Time is of the Essence.** Time is of the essence with respect to each covenant of this Loan Agreement.

10.19 **Construction; Interpretation.**

(a) The captions and headings of the Articles and Sections of this Loan Agreement are for convenience only and will be disregarded in construing this Loan Agreement. Any reference in this Loan Agreement to an "Exhibit," an "Article" or a "Section" will, unless otherwise explicitly

provided, be construed as referring, respectively, to an Exhibit attached to this Loan Agreement or to an Article or Section of this Loan Agreement.

(b)     Any reference in this Loan Agreement to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time.

(c)     Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular. The use of one gender includes the other gender, as the context may require.

(d)     As used in this Loan Agreement, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."

(e)     Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document in this Loan Agreement will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Loan Agreement), and (ii) any reference in this Loan Agreement to any Person will be construed to include such Person's successors and assigns.

(f)     Any reference in this Loan Agreement to "Lender's requirements," "as required by Lender," or similar references will be construed, after Securitization, to mean Lender's requirements or standards as determined in accordance with Lender's and Loan Servicer's obligations under the terms of the Securitization documents.

## ARTICLE XI    DEFINED TERMS.

Capitalized terms used but not otherwise defined in this Loan Agreement have the following definitions:

"**Affiliate**" of any Person means (i) any other individual or entity that is, directly or indirectly, (A) in Control of the applicable Person, (B) under the Control of the applicable Person or (C) under common Control with the applicable Person; (ii) any individual that is a director or officer of the applicable Person or (iii) any individual that is a director or officer of any entity described in clause (i) of this definition.

"**Aluminum Wiring Event**" is defined in Section 6.09(h).

"**Attorneys' Fees and Costs**" means: (i) fees and out of pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; (iii) investigatory fees; and (iv) costs for any opinion required by Lender pursuant to the terms of the Loan Documents.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as amended from time to time.

"**Bankruptcy Event**" means the occurrence of any of the following:

(a)     Borrower voluntarily files for bankruptcy protection under the Bankruptcy Code.

(b)     Borrower voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

(c)     The Mortgaged Property or any part of the Mortgaged Property becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

(d)    An order of relief is entered against Borrower pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by a Related Party. If Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, or any Related Party has solicited creditors to initiate or participate in such a proceeding, regardless of whether any of the creditors solicited actually initiates or participates in the proceeding, then such proceeding will be considered as having been initiated by a Related Party.

(e)    An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against Borrower (by a party other than Lender) but only if Borrower has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Borrower to contribute or cause the contribution of additional capital to Borrower.

(f)    If Borrower is a general partnership, any of the following occur:

    (i)    Any general partner of Borrower voluntarily files for bankruptcy protection under the Bankruptcy Code.

    (ii)    Any general partner of Borrower voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

    (iii)    An order of relief is entered against any general partner of Borrower pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by a Related Party.

    (viii)    An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against any general partner of Borrower (by a party other than Lender) but only if Borrower or such general partner of Borrower has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Borrower or such general partner of Borrower to contribute or cause the contribution of additional capital to Borrower.

"**Books and Records**" is defined in Section 6.07(a).

"**Borrower**" means all Persons identified as "Borrower" on page 1 of this Loan Agreement, together with their successors and assigns.

"**Borrower Principal**" means any of the following: (i) any general partner of Borrower (if Borrower is a partnership), (ii) any manager or managing member of Borrower (if Borrower is a limited liability company), (iii) any Person (limited partner, member or shareholder) with a collective direct or indirect equity interest in Borrower equal to or greater than 25% (if Borrower is an entity) (iv) any trustee of Borrower (if Borrower is a trust), or (v) any Guarantor.

"**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which Lender or the national banking associations are not open for business.

"**Claim**" is defined in Section 9.02(e).

"**Closing Date**" means the date on which Lender disburses the proceeds of the Loan to or for the account of Borrower.

"**Commitment Letter**" means the fully executed commitment letter or early rate lock application between Lender and Borrower issued in connection with the Loan.

"**Condemnation**" is defined in Section 6.11(a).

"**Control**" means to possess, directly or indirectly through one or more intermediate entities, the power to direct or cause the direction of the management, operation, or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case may be.

For example, a trustee of a trust is a Person that Controls that trust; a general partner in a limited partnership is a Person that Controls that limited partnership; a managing member or a non-member manager of a limited liability company is a Person that Controls that limited liability company; members of a limited liability company with a voting interest that permits them (individually or collectively) to direct or control the decisions of the limited liability company are Persons that Control that limited liability company; every general partner in a general partnership or member in a joint venture is a Person that Controls that entity; a shareholder of a corporation that holds 50% or more of the shares in the corporation (whether individually or in the aggregate with its Affiliates) is a Person that Controls that corporation.

"**Default Rate**" is defined in the Note.

"**Disclosure Document**" is defined in Section 10.10.

"**Economic Sanctions Laws**" means the foreign assets control regulations, 31 C.F.R. Chapter V, as amended, and any amending legislation or executive order relating to such legislation, as administered by OFAC.

"**Eligible Account**" means an identifiable account which is separate from all other funds held by the holding institution that is either (i) an account or accounts maintained with the corporate trust department of a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution, or (ii) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" means a federal or state chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., P-1 by Moody's Investors Service, Inc. and F-3 by Fitch, Inc. in the case of accounts in which funds are held for 30 days or less or, in the case of letters of credit or accounts in which funds are held for more than 30 days, the long term unsecured debt obligations of which are rated at least "A" by Fitch, Inc. and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and "A2" by Moody's Investors Service, Inc. If at any time an Eligible Institution does not meet the required rating, then the Loan Servicer must move the Eligible Account within 30 days of such event to an appropriately rated Eligible Institution.

"**Environmental Permit**" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor provision.

"**Fixtures**" is defined in the Security Instrument.

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation.

"**Galvanized Steel/PB Piping Event**" is defined in Section 6.09(i).

"**Governmental Authority**" means any board, commission, department, agency or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, which has or acquires jurisdiction over the Mortgaged Property, or the use, operation or improvement of the Mortgaged Property, or over Borrower.

"**Guarantor**" means the Person(s) required by Lender to guaranty all or a portion of Borrower's obligations under the Loan Documents, as set forth in the Guaranty. The required Guarantors as of the Effective Date are set forth in Article I.

"**Guaranty**" means the Guaranty (whether one or more) executed by Guarantor and/or any replacement or supplemental guaranty executed pursuant to the terms of this Loan Agreement.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (PCBs) and compounds containing them; lead and lead-based paint; asbestos or asbestos containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling and any other material or substance now or in the future that (i) is defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" by or within the meaning of any Hazardous Materials Law, or (ii) is regulated in any way by or within the meaning of any Hazardous Materials Law.

"**Hazardous Materials Law**" and "**Hazardous Materials Laws**" means any and all federal, state and local laws, ordinances, regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future, including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101 et seq., and their state analogs.

"**Immediate Family Members**" means a Person's spouse, parent (including step-parent), child (including stepchild), grandchild (including step-grandchild) or sibling (including step-siblings).

"**Improvements**" is defined in the Security Instrument.

"**Indebtedness**" means (i) the principal of, (ii) interest at the fixed or variable rate set forth in the Note on the principal of, and (iii) all other amounts due at any time under, the Note, this Loan Agreement or any other Loan Document, including prepayment charges, late charges, default interest, and advances to protect the security of the Security Instrument as provided in Section 8.02.

"**Insurance**" means Property Insurance, liability insurance and all other insurance that Lender requires Borrower to maintain pursuant to this Loan Agreement.

"**Insurance Reserve Fund**" is defined in Section 4.02(a).

"**Land**" means the land described in Exhibit A to the Security Instrument.

"**Leases**" is defined in the Security Instrument.

"**Lender**" means the entity identified as "Lender" on page 1 of this Loan Agreement, or any subsequent holder of the Note.

"**Lien**" means any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance on the Mortgaged Property.

"**Loan**" is defined on page 1 of this Loan Agreement.

"**Loan Documents**" means the Note, the Security Instrument, this Loan Agreement, the Guaranty, all other guaranties, all indemnity agreements, all collateral agreements, UCC filings, O&M Programs, the MMP and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan.

"**Loan Servicer**" means the entity that from time to time is designated by Lender to collect payments and deposits and receive Notices under the Note, the Security Instrument, this Loan Agreement and any other Loan Document, and otherwise to service the Loan for the benefit of Lender.

"**Manager**" or "**Managers**" means a Person who is named or designated as a manager or managing member or otherwise acts in the capacity of a manager or managing member of a limited liability company in a limited liability company agreement or similar instrument under which the limited liability company is formed or operated.

"**Material Adverse Effect**" means a significant detrimental effect on: (i) the Mortgaged Property, (ii) the business, prospects, profits, operations or condition (financial or otherwise) of Borrower, (iii) the enforceability, validity, perfection or priority of the Lien of any Loan Document, or (iv) the ability of Borrower to perform any obligations under any Loan Document.

"**Maturity Date**" is defined in the Note.

"**MMP**" means a moisture management plan to control water intrusion and prevent the development of Mold or moisture at the Mortgaged Property throughout the term of this Loan Agreement.

"**Mold**" means mold, fungus, microbial contamination or pathogenic organisms.

"**Mortgaged Property**" is defined in the Security Instrument.

"**Non-Residential Lease**" is a Lease of a portion of the Mortgaged Property to be used for non-residential purposes.

"**Non-U.S. Equity Holder**" means any Person with a collective equity interest (whether direct or indirect) of 10% or more in Borrower, and which is either (a) an individual who is not a citizen of the United States, or (b) an entity formed outside the United States.

"**Note**" means the Note (including any Amended and Restated Note, Consolidated, Amended and Restated Note, or Extended and Restated Note) evidencing the Indebtedness executed by Borrower in favor of Lender and dated as of the Effective Date, including all schedules, riders, allonges and addenda.

"**Notice**" or "**Notices**" means all notices, demands, Lender approvals, and other communication required under the Loan Documents, provided in accordance with the requirements of Section 10.03.

"**O&M Program**" is a written operations and maintenance program for certain Hazardous Materials.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Operational Repairs**" are identified in the Physical Risk Report and consist of minor deficiencies, minor deferred maintenance, and handicap accessibility enhancements that Borrower must complete as part of its general Repairs and maintenance of the Mortgaged Property.

"**Permitted Property**" means, for a Borrower that is identified in Article I as a Restricted Multiple Asset Entity, real property other than the Mortgaged Property that Borrower has disclosed in writing to Lender it owns as of the Effective Date.

"**Person**" means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

"**Personalty**" is defined in the Security Instrument.

"**Physical Risk Report**" means the Physical Risk Report (Form 1104) prepared by the physical risk consultant engaged by Lender in conjunction with the underwriting of this Loan that Lender provided to Borrower prior to or in connection with the issuance of the Commitment Letter. The Physical Risk Report identifies, among other

items, necessary repairs at the Mortgaged Property such as Priority Repairs (including PR-90 Repairs) and Operational Repairs.

"**PR-90 Repairs**" are identified in the Physical Risk Report and are a subset of Priority Repairs. These are imminent life safety hazards and matters that will cause substantive damage to the Mortgaged Property if left uncorrected.

"**Preapproved Intrafamily Transfer**" is defined in Section 7.04.

"**Prepayment**" is defined in the Note.

"**Principal**" is defined in the Note.

"**Prior Lien**" means a pre-existing mortgage, deed of trust or other Lien encumbering the Mortgaged Property.

"**Priority Repairs**" are identified in the Physical Risk Report and include PR-90 Repairs. With the exception of PR-90 Repairs, these are non-imminent life safety hazards, violations of federal, State, or local law, ordinance or code related to zoning, subdivision, and use, building and housing accessibility (including the Americans with Disabilities and Fair Housing Acts), health matters, fire safety matters, material deficiencies, or significant deferred maintenance.

"**Prohibited Activity or Condition**" means each of the following:  (i) the presence, use, generation, release, treatment, processing, storage (including storage in above-ground and underground storage tanks), handling or disposal of any Hazardous Materials on or under the Mortgaged Property, (ii) the transportation of any Hazardous Materials to, from or across the Mortgaged Property, (iii) any occurrence or condition on the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws, (iv) any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property and (v) any violation or noncompliance with the terms of any O&M Program.

However, the term "Prohibited Activity or Condition" does not include lawful conditions permitted by an O&M Program or the safe and lawful use and storage of quantities of:  (i) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties, (ii) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property, and (iii) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

"**Prohibited Parties List**" means any one or more of the following:

      (i)     The OFAC Specially Designated Nationals and Blocked Persons List.
      (ii)    The OFAC Consolidated Sanctions List.
      (iii)   The list of individuals and entities prohibited from doing business with the Department of Housing and Urban Development.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Property Manager**" means either the Person that manages the Mortgaged Property as of the Effective Date or another residential rental property manager approved by Lender that manages the Mortgaged Property.

"**Rating Agencies**" means Fitch, Inc., Moody's Investors Service, Inc., or Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor entity of the foregoing, or any other nationally recognized statistical rating organization.

"**Regulatory Agreement**" means any recorded or unrecorded agreement with a Regulatory Agreement Agency that encumbers the Mortgaged Property and which imposes use, occupancy and/or rent restrictions on the Mortgaged Property and/or its operation.

"**Regulatory Agreement Agency**" means a Governmental Authority, acting through any authorized representative, or any quasi-governmental authority, that is entitled to enforce the provisions of a Regulatory Agreement that encumbers the Mortgaged Property.

"**Related Party**" means all of the following:

      (a)     Borrower.

      (b)     Any general partner of Borrower if Borrower is a general partnership.

      (c)     Any Guarantor.

      (d)     Any Person that holds, directly or indirectly, any ownership interest (including any shareholder, member or partner) in Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, or any Person that has a right to manage Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor.

      (e)     Any Person in which Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor has any ownership interest (direct or indirect) or right to manage.

      (f)     Any Person in which any partner, shareholder, or member of Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor has an ownership interest or right to manage.

      (g)     Any Person in which any Person holding an interest in Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor also has any ownership interest.

      (h)     Any creditor of Borrower that is related by blood, marriage or adoption to Borrower or any Guarantor.

      (i)     Any creditor of Borrower or any general partner of Borrower if Borrower is a general partnership that is related to any partner, shareholder or member of, or any other Person holding an interest in, Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor.

"**Remedial Work**" is defined in Section 6.12(f).

"**Rent(s)**" is defined in the Security Instrument.

"**Rent Schedule**" means a written schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender.

"**Repairs**" means all repairs made to the Mortgaged Property, including all Priority Repairs (including PR-90 Repairs) and Operational Repairs identified in the Physical Risk Report.

"**Replacement Cost**" means the estimated replacement cost of the Improvements, Fixtures, and Personalty (or, when used in reference to a property that is not the Mortgaged Property, all improvements, fixtures, and personalty located on such property), excluding any deduction for depreciation, all as determined annually by Borrower using customary methodology and sources of information acceptable to Lender. Replacement Cost will not include the cost to reconstruct foundations or site improvements, such as driveways, parking lots, sidewalks, and landscaping.

"**Reserve Fund**" means the Tax Reserve Fund, Insurance Reserve Fund, Special Purpose Reserve Fund, Capital Replacement and Repair Reserve Fund, and any other account established pursuant to Article IV.

"**Restoration**" is defined in Section 6.10(j).

"**Secondary Market Transaction**" means: (i) any sale or assignment of this Loan Agreement, the Note and the other Loan Documents to one or more investors as a whole loan, (ii) a participation of the Loan to one or more investors, (iii) any deposit of the Loan Documents with a trust or other entity which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or other entity, or (iv) any other sale, assignment or transfer of the Loan or any interest in the Loan to one or more investors.

"**Securitization**" means a transaction in which the Note or any portion of the Note is assigned to a REMIC or grantor trust.

"**Security Instrument**" means the mortgage, deed of trust, deed to secure debt or other similar security instrument encumbering the Mortgaged Property and securing Borrower's performance of its Loan obligations, including Borrower's obligations under the Note and this Loan Agreement (including any Amended and Restated Security Instrument, Consolidation, Modification and Extension Agreement, Extension and Modification Agreement or similar agreement or instrument amending and restating existing security instruments).

"**Stab-Lok Event**" is defined in Section 6.09(j).

"**Tax Code**" means the Internal Revenue Code of the United States, 26 U.S.C. Section 1 et seq.

"**Tax Reserve Fund**" is defined in Section 4.02(a).

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, whether general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a Lien on the Land or the Improvements, including any payments made in lieu of Taxes.

"**Transfer**" means any of the following: (i) a sale, assignment, transfer or other disposition or divestment of any interest in Borrower, a Person that Controls Borrower, or the Mortgaged Property (whether voluntary, involuntary or by operation of law), (ii) the granting, creating or attachment of a Lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law), (iii) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock, (iv) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or Manager in a limited liability company, (v) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity and (vi) a change of Guarantor.

For purposes of defining the term "Transfer," the term "partnership" means a general partnership, a limited partnership, a joint venture, a limited liability partnership, or a limited liability limited partnership and the term "partner" means a general partner, a limited partner, or a joint venturer.

"Transfer" does not include any of the following: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Security Instrument, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the Bankruptcy Code or (iii) the filing or recording of a Lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

"**Transfer Fee**" means a fee paid when the Transfer is completed. Unless otherwise specified, the Transfer Fee will be 1% of the outstanding principal balance of the Indebtedness as of the date of the Transfer.

"**Transfer Processing Fee**" means a nonrefundable fee of $2,500 for Lender's review of a proposed or completed Transfer.

"**UCC**" means the Uniform Commercial Code as promulgated in the applicable jurisdiction.

**BORROWER:**

**160 PALISADE REALTY PARTNERS LLC,** a New York limited liability company

By: _____

    Name:    Ruben Guerrero
    Title:     Managing Member

**LENDER:**

**CBRE CAPITAL MARKETS, INC.,** a Delaware corporation

By: _____
Name: Melissa Majewski
Title: Vice President

EXHIBIT A

**DISBURSEMENT REQUEST**

|  |  |
|---|---|
| Freddie Mac Loan Number: | _____ |
| Property Name: | _____ |

Borrower: _____
Lender: _____
Date of Request: _____

Borrower requests from Lender disbursement of funds in the amount of $_____ from the Capital Replacement and Repair Reserve Fund to reimburse Borrower for Capital Replacements and/or Priority Repairs described in Section 1 below in accordance with the terms of the Loan Agreement ("**Disbursement**"). Borrower represents and warrants to Lender that the following information is true and correct as of the Date of Request shown above:

1.  Borrower is requesting Disbursement for the following completed Capital Replacements and/or Priority Repairs (collectively, "**Disbursement Request Work**"):

    _____

    _____

2.  Borrower has not previously received a disbursement from the Capital Replacement and Repair Reserve Fund to pay for the Disbursement Request Work.

3.  Borrower has obtained or caused to be obtained all licenses, permits, and approvals of any Governmental Authority required for the Disbursement Request Work, as completed or completed to the applicable stage.

4.  All of the Disbursement Request Work has been performed and/or installed on the Mortgaged Property in a good and workmanlike manner with suitable materials in accordance with good building practices and all applicable laws, ordinances, rules and regulations, building setback lines and restrictions applicable to the Mortgaged Property.

5.  The materials, supplies and equipment furnished or installed for the Disbursement Request Work are not subject to any Lien or security interest unless (i) the Disbursement is to be used to satisfy any such Lien or security interest or (ii) Borrower has properly provided bond or other security against loss in accordance with applicable law.

6.  This Disbursement Request is accompanied by paid invoices or bills that show Borrower has paid for the Disbursement Request Work.

7.  There is no Event of Default that has occurred and is continuing under the Loan Documents.

8.  All capitalized terms used but not defined in this Disbursement Request will have the meanings given to them in the Loan Agreement.

BORROWER:

_____

Name:
Title:

**EXHIBIT B**

| Loan Agreement Modifications |
|---|
| None |

| Special Purpose Reserve Fund Release Conditions |
|---|
| None |

| Additional Capital Replacements |
|---|
| None |